**ABERNATHY–THOMAS ENGINEERING CO.,**
Plaintiff,

v.

**PALL CORPORATION, Pall Ultra Fine Filtration Corporation, Pall Process Filtration Corporation, Pall Trinity Micro Corporation, Pall Puerto Rico Inc., Pall Micro Metallic Division, and Pall Advanced Separation Systems,** Defendants.

**Civil Action No. 96–CV–5315(DGT).**

United States District Court,
E.D. New York.

June 27, 2000.

John B. Madden, Jr., Arent Fox Kintner Plotkin & Kahn, PLLC, New York City, for Plaintiff.

Joseph Ortego, James W. Weller, Nixon Peabody LLP, Garden City, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

Plaintiff Abernathy–Thomas Engineering Co. ("Abernathy") brought this action against defendant Pall Corporation and several of its subsidiaries (collectively, "Pall") alleging fraud, misuse of proprietary information, unfair competition, tortious interference with contract, breach of fiduciary duty, and a debt owed on a commission contract, all in connection with Pall's termination of an exclusive distribution agreement with Abernathy. In response, Pall asserted counterclaims against Abernathy for a debt owed and for breach of contract. After conducting discovery, Pall moved for summary judgment on all claims, and Abernathy moved for partial summary judgment on its commission contract claim and on Pall's counterclaims.

## Background

The facts of this case, viewed in the light most favorable to the non-moving party with respect to each claim, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Ward v. Thomas,* 207 F.3d 114, 119 (2d Cir.2000), are as follows.

### (1)

Pall is a large, publicly-held company that sells industrial filters. (Ellis Decl. of

9/9/99, ¶¶ 1–2 [hereinafter Ellis Decl. I].) Abernathy is a closely-held distributor of various industrial products, including filters. (Ellis Dep. at 9, 37.) From some time in the 1950s until March 12, 1993, Abernathy (and its predecessor, Equipment Sales Corporation) acted as the exclusive distributor of, and sales representative[1] for, Pall's filtration products in Tennessee, Kentucky, North Carolina, and South Carolina (the "Territory"). (Ellis Decl. I, ¶ 3; Festa Dep. at 43.) Prior to retaining Abernathy as its sales representative, Pall had little or no sales in this Territory. (Ellis Decl. I, ¶ 5.) By 1993, sales of Pall products secured by Abernathy's efforts in the Territory had grown to approximately $5,000,000 annually and were generated by numerous customers, all of which had been developed by Abernathy over forty years. (*Id.* ¶ 6.) In addition, Abernathy developed valuable information about these customers that has helped Pall to preserve and increase its sales in the Territory. (*Id.* ¶ 7.) This information included the types of filters used by each customer, the filter layouts at each customer plant, customer purchase projections, and plant development plans. (*Id.*; Festa Dep. at 45.)

### (2)

By the 1990s, sales of Pall products constituted the bulk of Abernathy's total sales, giving Pall considerable influence over Abernathy and allowing it to impose a number of obligations on Abernathy through its Exclusive Distribution Agreement[2] with Abernathy. (Ellis Decl. I, ¶ 8.) Most pertinent to this action was a covenant under which

1. As the terms "distributor" and "sales representative" are used by the parties, a sales representative markets and sells products to the customer, while a distributor stores and ships the product. (Festa Dep. at 42.)

2. Pall sells its various product lines through separately incorporated subsidiaries. Pall's practice is to have its distributors sign separate distribution and/or sales representative agreements with each of its subsidiaries. Be-

[t]he Distributor agree[d] to send the Company a monthly report of all shipments to customers of Products, indicating specific products, including quantity, in substantially the following manner: *Customer State, City Part Number Quantity Date Shipped*

(Ortego Affirm., Ex. C, § IV(f)). The Exclusive Distribution Agreement does not contain a confidentiality clause in the distributor's favor, and at no point in their relationship did Pall indicate to Abernathy that the information collected under Section IV(f) would not be disclosed to anyone else. (Ellis Dep. at 104, 114–15; Prevatte Dep. at 24.) On the contrary, the Agreement provided:

The Company [Pall] may use such information as it sees fit to aid in the distribution, marketing, sales, promotion, or manufacture of its Products.

(Ortego Affirm., Ex. C, § IV(f)). Moreover, Abernathy's vice president Deryl Prevatte ("Prevatte") could not recall any occasion on which Abernathy sought to modify the Agreement with a promise of confidentiality from Pall. (Prevatte Dep. at 48.)

Nonetheless, Abernathy assumed that the customer information supplied to Pall would be kept in confidence. (Ellis Dep. at 114 ("We had no reason to doubt that they would do otherwise.").) In this regard, it is should be noted that Pall's former senior vice-president Robert J. Festa ("Festa") conceded in deposition that the relationship between Pall and its distributors was a "close" one, akin to a "partnership," and that it involved an "element of trust." (Festa Dep. at 53–54.)

cause the distributor agreements and sales representative agreements with each of the subsidiaries are identically worded, (*see* Ortego Affirm., Exs. C, D), the various distribution agreements will be referred to collectively as "the Exclusive Distribution Agreement" or the "Agreement," and the various sales representative agreements will be referred to collectively as "the Sales Representative Agreement."

Accordingly, pursuant to Section IV(f) of the Agreement, Abernathy sent Pall copies of every invoice for every Pall product it sold, which Pall then entered into a computer database. (Prevatte Dep. at 27; Festa Dep. at 47–48.) Each invoice indicated the customer's name and address, and the quantity and part number(s) sold. (*Id.*) Prevatte stated that Pall began requiring Abernathy to supply this information in the 1980s, or maybe even as far back as the 1970s. (Prevatte Dep. at 30.)

Over the years, Pall gained further familiarity with Abernathy's customers by occasionally sending its own employees to accompany Abernathy sales representatives on visits to Abernathy's customers. (Prevatte Dep. at 30; Festa Dep. at 43–45.) In addition, acting on the information obtained from Abernathy, Pall employees would from time to time directly contact Abernathy's customers by telephone, beginning sometime before 1990. (Ellis Dep. at 148–49; Prevatte Dep. at 32; Festa Dep. at 44.) Such direct contacts with Abernathy's customers were expressly authorized by the Exclusive Distribution Agreement, provided that Pall paid the distributor the appropriate commission on such sales:

> The Company shall have the right to make direct sales of Products to customers in the Markets in the Territory. In the event that the Company makes any direct sales of Products to customers in the Markets, located in the Territory, the Company shall pay to the Distributor a commission on such sales according to the commission schedule. . . .

(Ortego Affirm., Ex. C, § VII(a).)

The final covenant relevant to this action was a best efforts clause that imposed certain manpower and training obligations on Abernathy:

> The Distributor agrees to use its best efforts to distribute, market, sell and promote the Products in the Territory, which shall be the Distributor's primary responsibility. . . . The Distributor . . . agrees to acquire, develop, train and sustain sufficient sales and service personnel to distribute, market, sell and promote the Products. The Distributor will enroll all new sales personnel in a Pall training program as soon after being hired as the Company deems necessary.

(*Id.*, § IV(a).)

(3)

Although the relationship between the two companies would appear to have been a satisfactory one for many years given its longevity, throughout the period from 1990 to 1993 Pall began to express dissatisfaction with Abernathy's performance in various respects. (Ellis Dep. at 60–64; Prevatte Dep. at 36.) Specifically, "[m]any people, various people" at Pall complained that Abernathy was not meeting the annual sales goals that Pall had set for Abernathy as part of the "Sales Action Plans" ("SAPs") developed by Abernathy and Pall each June or July. (Ellis Dep. at 61–63; *see also* Ellis Dep. at 16–17; Prevatte Dep. at 16–18; Festa Dep. at 20–22.)[3] Pall also complained about the knowledge and training of Abernathy's sales representatives. (Ellis Dep. at 62.) Finally, a recurring complaint voiced by Pall even before 1990 was that Abernathy did not have a sufficiently large sales force in place to market Pall's products effectively. (Ellis Dep. at

---

**3.** Pall desired for its distributors to achieve a 20% increase in sales each year. (Rapone Dep. at 202–04; Ortego Affirm., Ex. T, Letter from Pall to Abernathy of 6/4/91, at 2 ("Abernathy–Thomas Engineering Co. is an essential factor in our meeting the growth target of 20% per year. We need your commitment and leadership to succeed.").) Abernathy's sales of Pall products, however, decreased by 11.5% in fiscal year 1988 (i.e., August 1988 through July 1989), by 13.9% in fiscal year 1989, and despite a 27% rebound in fiscal year 1990, decreased by 23.1% in fiscal year 1991. (Ellis Dep. at 209–10; Ortego Affirm., Exs. R–V, X.) In fiscal year 1992, Abernathy had a second rebound in Pall sales of 24.3%, but in the first quarter of fiscal year 1993 (i.e., just before Abernathy's termination) Abernathy's sales of Pall products decreased by 17%. (Ortego Affirm., Exs. W, X.)

63–64, 126, 226; Prevatte Dep. at 20, 22–23; *see also* Prevatte Dep. at 85, 87.)

(4)

Until 1992, Abernathy—and all of Pall's other distributors—distributed Pall's products pursuant to exclusive distribution agreements and sales representative agreements that were terminable without cause by either party on thirty days notice. (Ortego Affirm., Ex. C, § VIII(a); *id.*, Ex. D, § VI(a).) Such thirty-day distributorship contracts are standard in the industrial products sector. (Ellis Dep. at 13–14, 46–47; Prevatte Dep. at 11–14.)

However, in November 1991, at an annual meeting with its various sales representatives and distributors, Pall hinted that it was considering granting some of its distributors longer term contracts. The theme for the meeting that year was "Renew in '92." At the Renew in '92 meeting, Pall's then-president and CEO, Maurice G. Hardy ("Hardy"), outlined various qualities that Pall was looking for in a distributor:

1) The distributor should be proficient at selling high value-added, leading edge technological products, and have an organization capable of partnering with the customer in order to satisfy the customers' needs for quality, of both product and service, and on-time delivery.

2) The distributor partner should be highly profitable and in so being, be able to sustain itself in business for an unlimited future period also, and provide the entrepreneurial management structure to ensure this.

(Ortego Affirm., Ex. H, at 8.) Hardy then intimated: "Providing that our distributor partner meets the criteria that I mentioned previously, Pall Corporation's management will have no problem—based on performance clauses being met—negotiating a long-term commitment with its distribution partners." (*Id.* at 9.)

Hardy, who had formerly been the head of Pall's distribution operation in Europe, had experienced success with the introduction of long-term contracts in Europe and felt that a similar practice would benefit sales in the United States. (Festa Dep. at 76; Rapone Dep. at 61.) However, at no point during the Renew in '92 meeting (or at any other time) did Hardy or any other Pall official expressly offer Abernathy a long-term contract or discuss the matter with any Abernathy officials personally. (Ellis Dep. at 75, 77, 88–91, 94.)

As a follow-up to Hardy's remarks on the possibility of negotiating long-term distribution contracts, Pall senior vice president Festa sent a memorandum to Abernathy and other distributors on January 27, 1992 (the "Festa Memo"), in which he noted that Hardy had "expressed his conviction that those distributors who establish a track record of meeting our requirements may be offered a two year contract." (Ortego Affirm., Ex. I, at 1.) In the memorandum, Festa explained that he was writing "to outline some of the criteria we will be using to determine who will be offered the extended term contract." (*Id.*) Festa then provided a list of factors that "at a minimum" would be considered before an award of a two-year contract would be made:

1) The distributor must provide for appropriate levels of manpower, training, and selling time. They must also hire Pall Product Managers, when requested by Pall Corporation. They must maintain a stable field sales organization.

2) The [Sales Action Plan] development and execution must be diligently pursued in a sincere effort to meet the sales targets arrived at in our joint SAP meetings.

3) The distributor must work with Pall in the implementation of a Quality Partnership between our companies. They must also pursue, with Pall's help, ISO 9002 (stocklist) Certifica-

tion.[4]

4) The distributor must maintain satisfactory levels of inventory, and report stock sales and inventory levels to Pall Corporation in a timely and complete manner.

5) The distributor must participate in our EDI network for order entry, as soon as it is in place.

6) The distributor will promptly follow up on all qualified leads provided by Pall Corporation, and report results in a timely manner.

7) The distributor will also be rated on other more subjective but equally important factors, including but not limited to, establishing a proper succession plan, preparing and sharing with us their yearly business plans, maintaining a willingness to commit resources to new market areas identified by Pall, and in general maintaining an attitude of loyalty towards, and a willingness to be a partner with Pall Corporation.

(*Id.* at 1–2.) Festa added that Pall expected to meet "over the next few months" with those distributors who qualified for the two-year contract. (*Id.* at 2.)

(5)

Abernathy claims that it took various actions over the course of 1992 to meet the enumerated criteria. (Ellis Decl. I, ¶ 12.) Since the late 1980s, Pall had been requesting that Abernathy hire or designate one of its employees, preferably one with technical expertise, to be a "Pall Product Manager," that is, an employee dedicated exclusively to managing the distributor's sales efforts for Pall products. (Prevatte Dep. at 87; Festa Dep. at 57.) At some point after Renew in '92, Abernathy finally responded to Pall's request by appointing Roger Ellis, the son of Abernathy's then-president Jim Ellis ("Ellis"), as its Pall Product Manager.[5] (Ellis Decl. I, ¶ 10; Prevatte Dep. at 87–89; Festa Dep. at 57–58.) In addition, Abernathy—which already had four of its employees enrolled in ISO 9002 training courses at its own expense before Renew in '92—switched its employees to an ISO 9002 training course that Pall was to give in February of 1993 at a discounted rate. (Ellis Dep. at 78, 184–85, 193; Ortego Affirm., Ex. K, at 4; *id.*, Ex. O, at 2.) Abernathy's management also reviewed whether Abernathy met the remaining requirements specified in the Festa Memo. (Ellis Dep. at 78.)[6]

Besides these steps, however, Abernathy did not change any clients or business relationships; nor did it alter the way in which it developed Pall sales or sold Pall products. (Ellis Dep. at 78–79; Prevatte

**4.** ISO 9002 is a "total quality management" ("TQM") standard for sales organizations. (Ellis Dep. at 184; Festa Dep. at 58–59; Ortego Affirm., Ex. K.)

**5.** It is not clear whether Roger Ellis was hired before or after Renew in '92. Although Jim Ellis's deposition testimony implies that Roger was hired in reliance on the Renew in '92 remarks, (Ellis Dep. at 99), Abernathy's Deryl Prevatte testified in deposition that Roger Ellis was already employed at Abernathy and that he was merely reassigned to the position of Pall Product Manager, (Prevatte Dep. at 88).

**6.** In its briefs, Pall appears to assume that Abernathy is claiming that its acts in reliance encompassed all the criteria set forth in the Festa Memo. (*See* Def.'s Mem. Supp. Mot. Summ. J. at 7–9 [hereinafter Def.'s Mem. Supp. I].) Pall's assumption appears to rest on the fact that, in a section of Abernathy's opposition brief discussing its fraud claims, Abernathy's counsel quotes the requirements outlined in the Festa Memo and then argues that Abernathy met each of those requirements. (*See* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. § I(b) [hereinafter Pl.'s Mem. Opp'n I].) Even if Abernathy's argument is so construed, argument of counsel is not admissible evidence. The summary given above of Abernathy's alleged acts in reliance is, therefore, limited to the acts that Abernathy's management actually testified were taken in reliance. When asked whether there were any acts taken in reliance on Renew in '92 or the Festa Memo besides the three discussed above, Abernathy's Jim Ellis answered: "I don't recall specifically outside of what I already stated." (Ellis Dep. at 79.)

Dep. at 54.) Moreover, the individual most knowledgeable about Abernathy's finances, Jim Ellis, (Ellis Dep. at 198), could not recall whether Abernathy expended any other monies in reliance on Renew in '92 or the Festa memo, (*id.* at 79), though in a subsequent declaration, Ellis estimated that Abernathy's efforts to secure a long-term contract with Pall cost it $200,000, (Ellis Decl. I, ¶ 21).[7]

### (6)

Despite the designation of Roger Ellis as Pall Product Manager, Pall's disenchantment with Abernathy appears to have grown. At some point in the fall of 1992, Deryl Prevatte heard through "the grapevine" that Pall was in some way dissatisfied with Abernathy's performance. (Prevatte Dep. at 34–35.) As a result, during a dinner meeting in Long Island with Festa and Pall's senior vice president in charge of distribution, Vincent Rapone ("Rapone"), on or about September 23, 1992, Prevatte asked whether they had any dissatisfaction with Abernathy's performance. (Prevatte Dep. at 36; *see also* Ellis Dep. at 155.) According to Prevatte, neither Rapone nor Festa indicated that Pall had any problem with Abernathy. (Prevatte Dep. at 37; *see also* Ellis Dep. at 155.)[8] Nonetheless, Prevatte continued to hear "rumors" about Pall's dissatisfaction with Abernathy from salespeople who had spoken to Pall regional representatives. (Prevatte Dep. at 35.)

On October 13, 1992, Abernathy's Jim Ellis called Rapone to inquire about what Pall's concerns were, if any. (Ellis Dep. at

156.) After speaking with other members of Pall's management, including Festa, Rapone called Ellis back on October 16, 1992, and indicated that Pall had four concerns with Abernathy's performance: (1) that Abernathy's accounts payable were 42 days behind; (2) that Abernathy had not met the sales goals specified in its first quarter Sales Action Plan; (3) that Roger Ellis was not spending all of his time on the Pall account, despite the fact that Abernathy had designated him to be the Pall Product Manager; and (4) that Abernathy did not have enough sales. (*Id.* at 156–159.) At his deposition in this action, Ellis could not recall whether he followed up with anyone from Pall regarding any of these four items. (*Id.* at 159.)

### (7)

Contemporaneously with these events, in 1992 Pall began to develop a new sales tracking program called "SITES." (Ellis Dep. at 105.) (The name appears to be an acronym, but neither of the parties has indicated what it stood for.) All of Pall's distributors were required to implement the new program. (Ellis Dep. at 107.) SITES was based on a computer program that allowed distributors to create a database of information on their customers. (*See* Pall Corp., *SITES Database System: Technical Reference and Users' Guide* 1–1 (n.d.), attached as exhibit to Letter from Defendant's Counsel to Chambers of 5/8/00 [hereinafter SITES Manual].) The SITES database was to contain much of the information that Pall had already obtained through customer invoices and direct con-

---

**7.** If, as Abernathy's Deryl Prevatte testified, Roger Ellis was already employed by Abernathy before Renew in '92, *see supra* note 5, and Abernathy's ISO 9002 training was to be provided by Pall at a discounted cost, (Ortego Affirm., Ex. K, at 4), it is difficult to understand on what basis Ellis arrives at this $200,000 figure. The only remaining act supposedly taken in reliance on the remarks made at Renew in '92 and in the Festa Memo was Abernathy's review of whether it already met the other requirements specified in the Festa Memo. (*See* Ellis Dep. at 78.) Presumably, the time and effort involved in that re-

view could not reasonably be valued at $200,-000.

**8.** Both Festa and Rapone testified that they did not recall this meeting or conversation. (Festa Dep. at 67; Rapone Dep. at 67.) Since, on summary judgment, all ambiguities must be resolved, and all factual inferences drawn, in the non-moving party's favor, *see Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *Ward,* 207 F.3d at 119, it will be assumed that the conversation did take place as described by Abernathy's Prevatte.

tacts, including the customers' names, addresses, contact people, and the number and types of filter housings and filter elements used at each location. (Ellis Dep. at 106–07, 109; Prevatte Dep. at 79; Festa Dep. at 172; Rapone Dep. at 38–39, 197; SITES Manual at 3–1, 4–4.) SITES, however, allowed the distributor and Pall to compile this information in a much more efficient and readily accessible form. (Ellis Dep. at 109–10; Festa Dep. at 172.)

In addition, each distributor's salespeople were to enter information on their customers' filter "change-out" dates into the SITES database. (Festa Dep. at 85–86; Rapone Dep. at 19–20, 39–40; SITES Manual at 4–4 to –8.) Industrial filters generally consist of a filter housing, which has a relatively long useful life, and a filter element, which has a much shorter useful life. (Festa Dep. at 86; Rapone Dep. at 26.) By keeping track of the dates on which a particular customer was likely to need a replacement filter element, Pall and its distributors could gain an advantage over competitors in the lucrative replacement filter market. (Festa Dep. at 131–32; Rapone Dep. at 19–20, 40.) One of the functions of the SITES program was to generate a report indicating which customers were approaching a change-out date for their filter elements. (SITES Manual at 1–1, 4–8, 6–1.) These reports allowed Pall's distributors to make anticipatory sales calls to those customers and thus beat their competitors to the sale. (Ellis Dep. at 110.) All of the information entered into each distributor's database, including customer change-out dates, was to be copied onto a computer disk and sent to Pall periodically. (Festa Dep. at 174; Ortego Affirm., Ex. E; SITES Manual at 7–1.)

Neither party's deposition witnesses could recall precisely when the SITES program was introduced. Abernathy's Jim Ellis testified only that it was begun sometime after Renew in '92, i.e., after November of 1991. (Ellis Dep. at 106.) As for Pall, Rapone testified that as of June 17, 1992 the SITES computer program had not been completed, (Rapone Dep. at 124), while Festa testified that it was operational by January 23, 1993, (Festa Dep. at 150–51). The documentary evidence produced to the court suggests that the SITES program was not implemented at Abernathy until January of 1993. Specifically, a letter from Abernathy to Pall dated June 4, 1992, indicates that, at that point, Pall had only just inquired as to the type of computer hardware used by its distributors. (Ortego Affirm., Ex. P.) Seven months later, on January 18, 1993, Abernathy signed an amendment to the Exclusive Distribution Agreement requiring Abernathy to participate in the SITES program (the "SITES Amendment"). (Ortego Affirm., Ex. E.) Finally, in a letter to Pall dated January 21, 1993, Abernathy indicated it was "moving along with [its] Sites Program" and "expect[ed] *to start* getting the[ ] reports back from the salesmen by the end of January." (*Id.*, Ex. O, at 2 (emphasis added).)

(8)

In the same January 21st letter, Abernathy's Ellis and Prevatte provided Pall's Festa with a monthly management report. (*Id.*) At the end of the letter, Ellis and Prevatte asked:

> Bob, [Abernathy] is interested in a long term contract with Pall. How can we get a long term contract? What do we need to do and who do we need to contact to be considered for the long term contract?

(*Id.* at 2.) As far as Prevatte could recall, this letter was the first and only time that Abernathy had broached the subject of the long-term contract with Pall. (Prevatte Dep. at 60.)

Unbeknownst to Ellis and Prevatte, however, granting Abernathy a long-term contract was the farthest thing from the minds of Pall's management in January of 1993. According to Rapone, Pall's management had become increasingly dissatisfied with Abernathy's declining sales in the fall of 1992. (Rapone Dep. at 193–94.)

Finally, Festa and several Pall officials who reported to him determined to find out whether there was another viable distributor for Pall products in the Territory. (Festa Dep. at 78–80; Rapone Dep. at 58, 192–93.) Festa directed Rapone to begin searching for a replacement for Abernathy. (Rapone Dep. at 57.) Rapone interviewed two potential replacements during the last two weeks of January 1993. (Festa Dep. at 154; Rapone Dep. at 162–63.) In early February 1993, Pall's management determined that Fluid Flow of North Carolina, Inc. ("Fluid Flow") could serve Pall's distribution needs in the Territory. (Festa Dep. at 80; Rapone Dep. at 195.) At that point, Pall's decision to terminate Abernathy became final. (Rapone Dep. at 195.) On February 11, 1993, Pall sent notice to Abernathy that it was terminating the distributorship agreements and that the termination would become effective in thirty days. (Ortego Affirm., Ex. Y.) Pall simultaneously appointed Fluid Flow to be its new exclusive distributor in the Territory. (Festa Dep. at 80.) [9]

### (9)

Abernathy claims that after Pall terminated its distributorship, some of its industrial filter customers terminated blanket supply contracts they had with Abernathy. (Ellis Dep. at 272–73.) In deposition, Abernathy's Jim Ellis could only recall one such customer by name, DuPont, but stated that Abernathy had documents that would show that there were others. (*Id.* at 273–74.) Nonetheless, in papers submitted ten months later on the instant motions, Abernathy has still not named these additional lost customers.

Abernathy's asserted damages do not rest solely on having lost its supplier of filtration products, however.[10] Abernathy claims that it lost additional business as a result of unfair competition from Pall and its new distributor in the Territory, Fluid Flow. Specifically, Abernathy claims that Pall gave Fluid Flow the customer information that Abernathy had compiled for Pall over the course of their forty-year relationship. (Ellis Dep. at 115–17.) As evidence that Pall had, through Fluid Flow, used this customer information to Abernathy's disadvantage, Ellis testified in deposition that:

> [I]mmediately after . . . Fluid Flow was appointed, a few of our customers told us that they got flyers from Fluid Flow telling them they were the new distributor for Pall.
>
> And at least one of those gave me a copy of the announcement that he received from Fluid Flow.
>
> And in this particular case, the individual said that he had been called by Fluid Flow.
>
> . . . .
>
> . . . [I]mmediately they were calling on the key individual that buys filters and so forth.
>
> And to my knowledge, Fluid Flow did not have at least this type of filter prior to taking on the Pall line and had no reason to call any [of the] individuals [who] told us that they had not been called on by Fluid Flow prior to this.

(*Id.* at 115–17; *see also* Prevatte Dep. at 45–46.) Ellis estimates that it would have taken Fluid Flow two years to compile this

---

9. Under the terms of the Exclusive Distribution Agreement, Pall was at liberty to do so:

   > In the event of termination hereof by either party, the Company shall have the right to appoint a new Distributor. The appointment may be made immediately after the Company submits or receives a notice of termination and shall be effective as of the effective date of termination.

   (Ortego Affirm., Ex. C, § VIII(b).)

10. It should be noted that Abernathy was without a supplier of filtration products for only two months. In May of 1992, Abernathy entered into an exclusive distribution agreement with a Pall competitor, Meissner Filtration Products, Inc. ("Meissner"). (Ellis Dep. at 12–13; Letter from Plaintiff's Counsel to Chambers of 5/16/00.) Interestingly, Meissner subsequently also terminated Abernathy in part of its sales territory because of poor sales performance. (Ellis Dep. at 13–16.)

information by its own efforts. (Ellis Decl. I, ¶ 19.)

Abernathy alleges that as a result of the termination of the distributorship and competition from Fluid Flow, it was able to replace only a small amount of its Pall business and had to lay off five or six employees in the year or so after the termination. (Ellis Dep. at 112, 118, 214–217.) [11]

A final claimed consequence of the termination was that another manufacturer with which Abernathy had a distributorship agreement, a company called Thermon, terminated its contract with Abernathy out of fear that without the Pall contract, Abernathy would not be able to maintain a large enough sales force to service its distribution needs. (Ellis Decl. I, ¶ 16.)

At the time of his deposition, Jim Ellis was unable to quantify how much Abernathy lost in profits because of the termination and its aftermath, (Ellis Dep. at 96, 111), though in a subsequent declaration Ellis estimated Abernathy's total lost profits at $250,000 per annum, (Ellis Decl. I, ¶ 21).

### (10)

The final issue raised in this action concerns an alleged unwritten incidental commission agreement relating to certain filters used in nuclear power plants. (Reply ¶¶ 15–16; Ellis Dep. at 121–22, 281–85.) Abernathy claims that pursuant to this agreement, Pall required it to store an excess inventory of nuclear filters during the late 1980s. (Ellis Dep. at 282–83.) Pertinently, Pall accounted for nuclear filters sent to its distributors as sales as soon as they were shipped to the distributor. (Festa Dep. at 95.) Abernathy's Ellis alleges that Pall used this storage arrangement and accounting convention to

artificially inflate the sales figures reported in its annual financial statements. (Ellis Dep. at 282–83.) Later, when a customer actually ordered the nuclear filters, Abernathy would send the invoiced filters back to Pall, which would then ship them to the customer. (*Id.* at 121–22.) In return for facilitating this scheme, Pall allegedly promised to pay Abernathy an extra five percent commission, in addition to the regular commission specified in the Agreement. (*Id.* at 281, 283.) Abernathy further charges that this practice was in violation of regulations promulgated by the Nuclear Regulatory Commission ("NRC") which require that certain filters used in nuclear reactors be shipped directly from the manufacturer to the customer in order to ensure that the filters have not deteriorated on the shelf. (*Id.* at 121–22; *see also* Festa Dep. at 87–88 (stating that NRC "regulations require that [this type of filter] come directly from the manufacturer of the product").) [12]

In its motion papers, Pall denies that it had any such side agreement with Abernathy. (Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. & Supp. Def.'s Cross–Mot. Summ. J. at 3–4 [hereinafter Def.'s Mem. Opp'n].) In deposition, however, Pall's Festa conceded the existence of an arrangement whereby Pall stored nuclear filters at Abernathy's facilities and then required Abernathy to the ship the filters back to Pall for inspection before shipping them to the customer. (Festa Dep. at 87–89, 92–95.) Moreover, although Festa could not recall whether Pall had promised to pay Abernathy an extra commission for storing the nuclear filters, he testified that it was "possible." (*Id.* at 161.)

Festa stated that the purpose of the arrangement was to ensure that nuclear filters could be sent out to its customers as

---

11. Notably, Roger Ellis—the former Pall Product Manager—was not laid off. (Ellis Dep. at 218.) This fact tends to undermine Jim Ellis's testimony that Abernathy specially hired his son to meet the requirements for the two-year contract with Pall. (*See id.* at 99.)

12. The court has not been able to identify the regulation to which the parties refer.

quickly as possible. (*Id.* at 94.) In light of Festa's admission that Pall had sufficient warehouse space to store the filters at its own facilities, (*id.* at 94), this explanation makes no sense. Obviously, Pall's arrangement *increased* the amount of time required to get the filters to customers by the amount of time that it took for the distributor to ship the filters back to Pall.

At any rate, shortly after the termination, Abernathy contacted Pall, requesting payment of special nuclear filter commissions that were allegedly owed but unpaid as of the date of termination. (Ellis Decl. of 8/9/99 [hereinafter Ellis Decl. II], Ex. 11, Memo from Ellis to Rapone of 4/8/93.) A volley of correspondence followed, (*id.*, Exs. 9–11), and on April 19, 1993, Pall took the position that it owed Abernathy no more than $4,745.56 on the account, (*id.*, Ex. 10). Abernathy disputes this figure and now seeks $62,867.00, which it claims Pall still owes it. (*Id.* ¶ 21.)

### Discussion

In its First Amended Complaint, plaintiff pled five causes of action: (1) fraud, (2) misuse of proprietary information, (3) unfair competition, (4) tortious interference with contract, and (5) breach of fiduciary duty. In its Answer, defendant interposed counterclaims for a debt owed and for breach of contract. Finally, in its Reply to defendant's Answer to its Amended Complaint, plaintiff makes a claim for special commissions due on the storage of certain nuclear filters. Defendant moves for summary judgment on all claims, and plaintiff cross-moves for partial summary judgment on its nuclear filter commissions claim and defendant's counter-claims. Each claim is discussed below, with the misuse of proprietary information and unfair competition claim analyzed together.

### (1)

Abernathy's cause of action for fraud encompasses two distinct claims. First, Abernathy alleges that, contrary to Pall's representations at Renew in '92 and in the Festa Memo, Pall never intended to offer Abernathy a long-term contract even if Abernathy met the stated conditions. Second, Abernathy asserts that Pall had made the decision to terminate Abernathy in or before July of 1992 but fraudulently concealed this fact from Abernathy. Abernathy charges that in both instances Pall's fraudulent misrepresentations and omissions were motivated by a desire to extract additional customer information from Abernathy before terminating Abernathy's distributorship. Pall moves for summary judgment on both claims, which are discussed separately below.

### a. Applicable Law

As an initial matter in this diversity action, the governing law must be determined. Because both parties have relied exclusively on New York law in their briefs, they have tacitly consented to the application of New York law, and no further conflict of laws analysis need be conducted. *See 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 743 (2d Cir.1999). Accordingly, New York law will be applied to all claims herein. *See id.*

To prove common law fraud under New York law, a plaintiff must show that: (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance. *See Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir.1998); *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995). Under New York law, each element of a fraud claim must be shown by clear and convincing evidence. *See Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 349–50, 704 N.Y.S.2d 177, 186, 725 N.E.2d 598 (1999); *Vermeer Owners, Inc. v. Guterman*, 78 N.Y.2d 1114, 1116, 578 N.Y.S.2d 128, 129, 585 N.E.2d 377 (1991); *Banque Arabe*, 57 F.3d at 153.

Clear and convincing evidence is evidence that makes the fact to be proved "highly probable." 1A *New York Pattern Jury Instructions—Civil* § 1:64 (3d ed.1999). Accordingly, Pall's motion for summary judgment must be granted if Abernathy has not produced evidence on which a reasonable jury could find that Abernathy has proven each element of its fraud claim by "clear and convincing evidence" as defined by New York law. *See Liberty Lobby,* 477 U.S. at 255–56, 106 S.Ct. at 2514.

■ To establish fraudulent concealment under New York law, a plaintiff must prove that: (1) the defendant failed to disclose material information that it had a duty to disclose; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the omission; and (4) the plaintiff suffered damage as a result of such reliance. *See Bermuda Container Line Ltd. v. International Longshoremen's Ass'n, AFL–CIO,* 192 F.3d 250, 258 (2d Cir.1999) (citing *Nasaba Corp. v. Harfred Realty Corp.,* 287 N.Y. 290, 295, 39 N.E.2d 243, 245 (1942)); *Banque Arabe,* 57 F.3d at 153. As with fraudulent misrepresentation claims, the plaintiff must prove each element of fraudulent concealment by clear and convincing evidence. *See Kuo Feng Corp. v. Ma,* 248 A.D.2d 168, 168–69, 669 N.Y.S.2d 575, 576 (1st Dep't 1998); *Board of Educ. v. Sargent, Webster, Crenshaw & Folley,* 146 A.D.2d 190, 199, 539 N.Y.S.2d 814, 820 (3d Dep't 1989); *Chase Manhattan Bank, N.A. v. T & N PLC,* 1998 WL 634218, at *2, 162 F.3d 1147 (2d Cir.1998) (Table); *Banque Arabe,* 57 F.3d at 153.

**b. Renew in '92 and the Long Term Contract**

■ Abernathy's fraud claim based on the promise of a long-term contract at Renew in '92 and in the Festa Memo must be dismissed because Abernathy has not produced evidence upon which a reasonable jury could find by clear and convincing evidence that the promise to negotiate a long-term contract with distributors who

met its requirements was false when made. Where a cause of action for fraud is based on a defendant's statement of future intention, in order to prove the element of misrepresentation, plaintiff must show that the defendant, at the time the promissory representation was made, never intended to honor or act on his statement. *See Boylan v. G.L. Morrow Co.,* 63 N.Y.2d 616, 619, 479 N.Y.S.2d 499, 500, 468 N.E.2d 681 (1984); *Lanzi v. Brooks,* 43 N.Y.2d 778, 779–80, 402 N.Y.S.2d 384, 384, 373 N.E.2d 278 (1977); *G & F Assocs. Co. v. Brookhaven Beach Health Related Facility,* 249 A.D.2d 441, 443, 671 N.Y.S.2d 510, 511–12 (2d Dep't 1998); *Non–Linear Trading Co. v. Braddis Assocs., Inc.,* 243 A.D.2d 107, 118, 675 N.Y.S.2d 5, 13 (1st Dep't 1998). The mere fact that Abernathy was not given a long-term contract is, as a matter of law, insufficient to establish that Pall fraudulently misrepresented its intentions. *See Getty Petroleum Corp. v. DeIorio,* 194 A.D.2d 762, 763, 599 N.Y.S.2d 829, 831 (2d Dep't 1993); *Lanzi v. Brooks,* 54 A.D.2d 1057, 1058, 388 N.Y.S.2d 946, 948 (3d Dep't 1976), *aff'd,* 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977); *Brown v. Lockwood,* 76 A.D.2d 721, 732–33, 432 N.Y.S.2d 186, 195 (2d Dep't 1980) ("Fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance. . . ."). Plaintiff must produce additional evidence of a present fraudulent intent to carry its burden of proof. *See Lockwood,* 76 A.D.2d at 733, 432 N.Y.S.2d at 195.

■ In its motion papers, Abernathy strenuously argues that it met the conditions for the award of a long-term contract recited in the Festa Memo. (*See, e.g.,* Pl.'s Mem. Opp'n I, at 4–6.) However, as just noted, the fact that a promissory representation is not fulfilled does not suffice to prove that the representation was fraudulent when made. Therefore, Abernathy's fraud claim can survive summary judgment only if it produces additional proof that Pall acted with an intent to deceive when it made the representations regard-

ing the long-term contract at Renew in '92 and in the Festa Memo.

Far from producing such additional proof, Abernathy's Ellis and Prevatte admitted in deposition that they had no basis for their allegation that Pall never intended to offer Abernathy a long-term contract:

> Q Subsequent to your termination or subsequent to this Renew meeting, did you ever learn of any facts that led you to believe that Pall did not intend to offer long-term contracts when it made that suggestion at that Renew meeting?
>
> A No.

(Ellis Dep. at 101–02),

> Q ... At the time of the Renew in '92 program when the issue of long-term contract was discussed, did you have any reason to believe that Pall never intended to offer a long-term contract to Abernathy–Thomas?
>
> A No.
>
> Q And at the time you received and reviewed [the Festa memo], did you have any reason to believe that Pall never intended to offer a long-term contract to Abernathy–Thomas?
>
> A No.
>
> Q At any point prior to being notified of the termination, did you have any reason to believe that Pall never intended to offer Abernathy–Thomas a distribution agreement, a long-term distribution agreement?
>
> A No.

(Prevatte Dep. at 65).

The only evidence that Abernathy cites in support of its claim is Rapone's statement that, as of the time he retired from Pall in 1993, Pall had awarded long-term contracts to only two of its sixty distributors. (Monack Decl. of 9/14/99, ¶ 10 (citing Rapone Dep. at 208–09).) If this fact were coupled with evidence showing that many of the other fifty-seven distributors that did not get a long-term contract also met the stated requirements for the contract, such combined evidence might create a

triable issue on the question of fraudulent intent. Abernathy, however, has not produced any such evidence. In the absence of such a showing, a reasonable jury could not find that Abernathy has proven a present fraudulent intent by clear and convincing evidence, i.e., proven that it was highly probable that Pall intended to deceive Abernathy when it made its promises at Renew in '92 and in the Festa Memo. Accordingly, Pall's motion for summary judgment on plaintiff's long-term contract fraud claim is granted.

### c. The alleged concealment of the decision to terminate Abernathy

As an independent act of fraud, or, to be more accurate, fraudulent concealment, Abernathy claims that Pall had made the decision to terminate Abernathy in July of 1992 or earlier but concealed that fact from Abernathy in order to extract additional information from Abernathy on its customers. Abernathy claims that it would not have signed the SITES amendment in January of 1993 and would have taken steps to prepare its other principals and its customers for the loss of the Pall contract if it had known Pall's decision at an earlier date. (Pl.'s Mem. Opp'n I, at 7–8.)

Pall, on the other hand, claims that it began to look for a replacement for Abernathy only about a month before Abernathy was terminated. Pall further claims that it did not make the final decision to terminate Abernathy until it found a replacement, which was just a few days before it sent notice to Abernathy. *See supra* Background (8).

Leaving aside the question of whether Pall had any duty to disclose its intentions to Abernathy over and above the thirty-day notice set forth in the Exclusive Distribution Agreement and the Sales Representative Agreement, Abernathy has not produced clear and convincing evidence that Pall in fact made the decision to terminate Abernathy at any time before the

date of the SITES amendment, viz., January 18, 1993. During his deposition, Abernathy's Jim Ellis referred to a file memorandum from the week of July 13, 1992, in which he noted that Les Kefauver, an Abernathy sales manager, told him that a Pall employee, Lee Clark ("Clark"), had, in turn, told him that Pall had decided to terminate Abernathy. (Ellis Dep. at 152–53; Letter from Plaintiff's Counsel to Chambers of 5/18/00.) Apparently in an effort to substantiate this claim by way of non-hearsay evidence, Abernathy's counsel drafted a declaration for Clark to sign which recited that Pall had made the decision to terminate Abernathy between May and July of 1992. Clark signed the declaration but—tellingly—crossed out the language to the effect that the decision had been made by July 1992. Instead, Clark stated in a handwritten note only that two other Pall employees had told him "at Regional Managers' meetings and in casual conversation during 1992 that Abernathy–Thomas sales performance was being criticized and that Pall was *considering* terminating Pall's relationship with Abernathy." (Clark Decl. ¶ 3 (emphasis added.)) [13] So corrected, Clark's declaration is entirely consistent with Ellis and Prevatte's testimony that Pall had been expressing dissatisfaction with the volume of Abernathy's sales, as well as the size and training of Abernathy's sales force, from 1990 onward and particularly in 1992. (Ellis Dep. at 16–17, 60–65, 126, 156–59, 226; Prevatte Dep. at 16–18, 20, 22–23, 34–36, 85–88.) The Clark declaration simply does not provide clear and convincing evidence upon which a reasonable jury could find that the decision to terminate Abernathy occurred in or before July 1992 and that Pall intentionally concealed this decision from Abernathy until February 11, 1993.

Abernathy also points to the September 23, 1992 meeting between Prevatte, Festa and Rapone, *see supra* Background (6), in an effort to buttress its claim that Pall deceived Abernathy regarding its alleged intention to terminate Abernathy. (Pl.'s Mem. Opp'n I, at 6.) Accepting Abernathy's account of the meeting as true for the purposes of this motion, *see supra* note 8, Festa and Rapone's denials that Pall had any problem with Abernathy at the time does not support Abernathy's claim of fraudulent concealment. The argument that those denials do support a finding of fraudulent concealment, presupposes that the decision to terminate had already been made. However, as evidence of that supposition, Abernathy again only cites the Clark declaration. (Pl.'s Mem. Opp'n I, at 6.) But, as just discussed, the Clark declaration does not provide the clear and convincing evidence required to establish that the decision to terminate was made at any time in 1992.

Moreover, in their depositions, Ellis and Prevatte candidly admitted that they had no other basis for their claim that Pall had made the decision to terminate Abernathy long before it gave Abernathy the contractually-required thirty days notice on February 11, 1993:

> Q Did you ever learn any information that indicated when Pall had made that decision to terminate Abernathy?
>
> A No.
>
> Q Did you ever learn any information indicating that they had made the decision to terminate Abernathy back in 1992?
>
> A No.

(Ellis Dep. at 120),

> Q Did you ever learn any information to indicate to you when it was that Pall made the determination to terminate Abernathy–Thomas?
>
> A No.
>
> Q Did you ever learn any information to indicate that Pall had made a determination to terminate Abernathy–

---

**13.** The original, printed language recited that Clark had been specifically told "between May and July, 1992 that the decision had been made to terminate Pall's relationship with Abernathy." (Clark Decl. ¶ 3.)

Thomas in 1992 prior to announcing that to Abernathy–Thomas in February 1993?

A No.

(Prevatte Dep. at 66). In light of these admissions and the text of the Clark declaration as sworn to, Abernathy has not produced evidence on which a reasonable jury could find that Abernathy has shown by clear and convincing proof that Pall made the decision to terminate Abernathy prior to the SITES amendment in January of 1993.

Apparently as a fall back argument, Abernathy claims that if Pall had disclosed that it was at least "considering" termination in 1992 (as Clark stated in his corrected declaration), Abernathy would have taken steps to reassure its other principals that it would still be able to meet their needs even if it lost the Pall contract. (Pl.'s Mem. Opp'n I, at 7.) This argument, too, fails. As noted above, damages are an essential element of a fraud claim under New York law. It is well-settled under New York law that a fraud action cannot be maintained where the damages attributable to the fraud are speculative or undeterminable. *See Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 422, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996); *Dress Shirt Sales, Inc. v. Hotel Martinique Assocs.*, 12 N.Y.2d 339, 344, 239 N.Y.S.2d 660, 664, 190 N.E.2d 10 (1963); *Geary v. Hunton & Williams*, 257 A.D.2d 482, 482, 684 N.Y.S.2d 207, 207 (1st Dep't 1999); *Giambrone v. Bank of N.Y.*, 253 A.D.2d 786, 787, 677 N.Y.S.2d 608, 610 (2d Dep't 1998). Abernathy, however, has produced no evidence—much less clear and convincing evidence—that if it had taken steps to reassure its other principals, those principals' fears would have been allayed and they would not have terminated their contracts with Abernathy. Indeed, for all that Abernathy has shown, its principals' reaction could have been just the opposite: if Abernathy had disclosed the possible loss of the Pall contract earlier, then to protect themselves Abernathy's principals might just as well have terminated their contracts with Abernathy earlier than they actually did, thus *increasing* Abernathy's losses. Abernathy's alternative concealment argument, therefore, is not sufficiently supported by admissible evidence to send the fraudulent concealment claim to the jury.[14]

**(2)**

In Counts II and III of the First Amended Complaint, Abernathy pleads causes of action for misuse of proprietary information and unfair competition, respectively. (First Am. Compl. ¶¶ 18–20.) The unfair competition claim is, however, based on "Pall's wrongful disclosure of Abernathy's proprietary information to Fluid Flow," and thus essentially restates the misuse of proprietary information claim.

---

**14.** In its papers, Abernathy does not appear to be arguing that Festa and Rapone's alleged misrepresentations at the September 23rd meeting with Prevatte concerning Pall's level of satisfaction with Abernathy's performance constituted an independent act of fraudulent misrepresentation (as opposed to fraudulent concealment). However, to the extent that Abernathy does intend to make this claim, it too fails to survive summary judgment. Three weeks after the September 23rd meeting, Rapone disclosed to Ellis that Pall was in fact unhappy with Abernathy's performance and recited a litany of complaints to Ellis. (*See* Ellis Dep. at 156–59.) Any claim of damages because of the intervening three weeks of deception would be grossly speculative and, thus, would not permit recovery for the same reasons discussed above.

Moreover, Ellis's testimony that he could not recall taking any steps to address the concerns expressed by Rapone and his failure to allege that he or anyone else at Abernathy discussed Rapone's disclosure with Abernathy's other principals belies the notion that Abernathy would have acted any differently had Festa and Rapone disclosed Pall's concerns at the September meeting with Prevatte rather than three weeks later. The causation element of a fraudulent misrepresentation claim based on the September 23rd meeting would have to be predicated on such a finding. For this reason too, then, any fraudulent misrepresentation claim based on the September 23rd meeting would fail to present an issue for the jury.

(*Id.* ¶ 20.) The two counts will, therefore, be treated as stating a single cause of action. *See CBS Corp. v. Dumsday*, 268 A.D.2d 350, ——, 702 N.Y.S.2d 248, 251 (1st Dep't 2000); *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505, 506 (4th Dep't 1998).

### a. Applicable Law

■ To prove a claim for the misappropriation of proprietary information under New York law, plaintiff must show (1) that the information constituted a trade secret, and (2) that the defendant used that trade secret (3) in breach of an agreement, a confidential relationship or duty, or as a result of discovery by improper means. *See North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999); *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.1993).

■ A trade secret is " 'any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it.' " *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 918, 624 N.E.2d 1007 (1993) (quoting Restatement of Torts § 757 cmt. b (1939)); *accord North Atlantic Instruments*, 188 F.3d at 44. In determining whether information constitutes a trade secret, New York courts consider the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Management*, 82 N.Y.2d at 407, 604 N.Y.S.2d at 918, 624 N.E.2d 1007 (quoting Restatement of Torts § 757 cmt. b (1939)); *accord North Atlantic Instruments*, 188 F.3d at 44.

■ A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor provided the information it contains is not otherwise readily ascertainable. *See Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392–93, 328 N.Y.S.2d 423, 427–28, 278 N.E.2d 636 (1972); *North Atlantic Instruments*, 188 F.3d at 44. The question of whether or not a customer list is a trade secret is generally a question of fact. *See Ashland Management*, 82 N.Y.2d at 407, 604 N.Y.S.2d at 918, 624 N.E.2d 1007; *North Atlantic Instruments*, 188 F.3d at 44.

### b. Pall used a trade secret possessed by Abernathy.

Abernathy has alleged that the customer information it supplied to Pall—which included not only the identity of its customers but also their filter change-out dates—was highly valuable and that it would have taken as many as two years for a new distributor to duplicate the information. Pall has not disputed this time estimate in its papers, and, indeed, the very *raison d'être* of its SITES program was a recognition of the commercial value of knowing its customers' change-out dates. Moreover, at oral argument, counsel for Pall expressly conceded that this information was valuable and that it would take a substantial amount of time to develop. (Tr. at 14–15.) Finally, Abernathy's Jim Ellis declared that Abernathy maintained this information as confidential with respect to third-parties. (Ellis Decl. II, ¶ 7.) Therefore, on the evidence now before the court, a reasonable jury could find that Abernathy's customer information constituted a trade secret as defined by New York law.

As for the element of use, Pall argues that even if Abernathy's customer informa-

tion qualifies as a trade secret, Abernathy has produced no evidence that Pall actually gave Fluid Flow Abernathy's customer information. However, Pall's Festa admitted during his deposition that SITES information was given to Fluid Flow when it signed on as Pall's new distributor in the Territory. (Festa Dep. at 85–86.) Thus, while it is unclear on the present record exactly how much of Abernathy's customer information was supplied to Fluid Flow, a reasonable jury could find that Pall disclosed at least some of Abernathy's customer information to Fluid Flow and, hence, that Abernathy has met its burden of proving misuse of its trade secrets.

**c. Abernathy stood in a confidential relationship with Pall, pursuant to which Pall owed Abernathy a duty of fidelity.**

There has been, and can be, no suggestion that Pall discovered Abernathy's customer information through improper means (e.g., industrial espionage), inasmuch as Pall obtained the information directly from Abernathy, with Abernathy's knowledge and consent, pursuant to a contractual obligation that required it to supply Pall with that information. The dispositive issue with respect to Abernathy's trade secrets claim is, therefore, whether Pall's use of Abernathy's customer information constituted a breach of a confidential relationship with or duty owed to Abernathy.

As an initial matter, it is clear that Pall did not have a contractual duty to keep Abernathy's customer information in confidence. The Agreement between Pall and Abernathy contains no express confidentiality clause in favor of Abernathy, and Abernathy's management conceded in deposition that Pall never orally agreed to keep the information in confidence.[15] Plaintiff's cause of action for misappropriation of its trade secrets, thus, reduces to the question of whether a confidential relationship existed between the parties that gave rise to a legal duty on defendant's part not to use that information to the detriment of plaintiff—in short, whether the factual contours of their relationship created a duty of fidelity on defendant's part.

█ This inquiry encompasses two distinct questions, one of law and one of fact. The first question—whether, given the facts regarding the two companies' relationship alleged by plaintiff, defendant owed plaintiff a duty—is a question of law for the court to determine. *See Kimmell v. Schaefer*, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 718, 675 N.E.2d 450 (1996); *Palka v. Servicemaster Management Servs. Corp.*, 83 N.Y.2d 579, 585, 611 N.Y.S.2d 817, 820, 634 N.E.2d 189 (1994); *Eiseman v. State*, 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 613, 511 N.E.2d 1128 (1987). The second—whether the facts of the relationship were as plaintiff alleges—is a question of fact for the jury. *See Kimmell*, 89 N.Y.2d at 263, 652 N.Y.S.2d at 718, 675 N.E.2d 450. Thus, on this motion for summary judgment, the court must resolve two questions: (1) accepting plaintiff's factual allegations regarding its relationship with Pall as true, did Pall owe Abernathy a duty as a matter of law?, and

---

15. When questioned whether there had been any oral or written modification of the Agreement with respect to confidentiality, Ellis testified as follows:

Q Do you recall any specific discussion where Pall personnel said that they would maintain the information about the customers on a confidential basis?

A No. We had no reason to doubt that they would do otherwise.

Q And do you recall ever seeing any documents other letters or memos in which Pall personnel assured you that they would maintain customer information in a confidential fashion?

A No, I don't recall any correspondence on that.
(Ellis Dep. at 114–115; *see also* Prevatte Dep. at 24, 48 (stating that Abernathy had never asked Pall to keep its customer information confidential and that Pall never promised that the information would not be shared with another distributor).)

(2) on the evidence presented to the court, could a reasonable jury find that the facts of the relationship were as Abernathy alleges? Both questions are answered in the affirmative.

■ Under New York law, a "distributorship agreement may, in some rare instances, create a confidential relationship out of which duty of fiduciary care arises." *Lake Erie Distributors, Inc. v. Martlet Importing Co.*, 221 A.D.2d 954, 955, 634 N.Y.S.2d 599, 601 (4th Dep't 1995) (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957); *Zimmer–Masiello, Inc. v. Zimmer, Inc.*, 159 A.D.2d 363, 552 N.Y.S.2d 935 (1st Dep't), *appeal dismissed*, 76 N.Y.2d 772, 559 N.Y.S.2d 986, 559 N.E.2d 680 (1990)); *see also Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 194, 428 N.Y.S.2d 628, 634, 406 N.E.2d 445 (1980) (noting that duty of fidelity may arise from a relationship of confidence and citing *Rampell*); *cf. W. Walley, Inc. v. Saks & Co.*, 266 A.D. 193, 198, 41 N.Y.S.2d 739, 743 (1st Dep't 1943) (relationship between department store and credit card issuer that supplied information on its customers to department store was one of confidence); *Matter of Sbarro Holding, Inc.*, 111 Misc.2d 910, 913, 445 N.Y.S.2d 911, 914 (1981) (relationship between large corporate franchisor and individual franchisee was one of confidence), *aff'd*, 91 A.D.2d 613, 456 N.Y.S.2d 416 (2d Dep't 1982).

In *Rampell*, the New York Court of Appeals denied a manufacturer's motion to dismiss a former distributor's complaint for the misappropriation of the distributor's sales staff and goodwill, holding that on the facts alleged by the distributor, a confidential relationship had arisen between the two. *See Rampell*, 3 N.Y.2d at 377, 165 N.Y.S.2d at 482, 144 N.E.2d 371. The *Rampell* distributor alleged that it had been the defendant manufacturer's exclusive distributor in a particular territory for fifteen years and that it had expended substantial amounts of money, time and

effort to develop, and had in fact developed, a sales organization and market for the manufacturer's products. *See id.* at 374, 165 N.Y.S.2d at 480, 144 N.E.2d 371. The relationship was brought to an abrupt end when the manufacturer terminated the distributorship agreement, hired the plaintiff's key sales people, and began direct sales in the former distributor's territory. *See id.* at 375, 165 N.Y.S.2d at 480, 144 N.E.2d 371.

In deciding whether the manufacturer's inducement of the distributor's employees to terminate their employment agreements with the distributor was tortious, the Court of Appeals first observed that the relationship between a distributor and a manufacturer is generally not a relationship of "economic equals," but rather a relationship "which is recognized to be that of dependency of the latter upon the former." *Id.* at 376, 165 N.Y.S.2d at 481, 144 N.E.2d 371 (citations omitted). The court warned, however, that "[t]his dominance taken alone may be insufficient to show such a relation of confidence as would make the action by [the manufacturer] here actionable." *Id.* The Court of Appeals found additional facts sufficient to support a finding of a confidential relationship where

> [p]ursuant to the contract . . ., plaintiff was obliged to make its lists of prospective customers available to [the manufacturer]; to keep records of its demonstrating, canvassing and soliciting available to [the manufacturer]; to give [the manufacturer] reports on its inventory and its financial condition, or 'any other information regarding [the distributor's] business which may be reasonably required by [the manufacturer].'

*Id.* at 377, 165 N.Y.S.2d at 482, 144 N.E.2d 371.

On the basis of similar allegations, the Appellate Division found that a confidential relationship existed between manufacturer and distributor in *Zimmer*. The *Zimmer* plaintiff had acted as the exclu-

sive distributor of the defendant's surgical equipment and orthopedic supplies. *See Zimmer*, 159 A.D.2d at 364, 552 N.Y.S.2d at 936. After an eleven-year relationship, the manufacturer terminated the distribution agreement, hired many of the distributor's employees, and began direct sales to the distributor's former customers. *See id.* The Appellate Division found that the plaintiff distributor had established the existence of a fiduciary duty on the part of the manufacturer where

> [t]he manufacturer ... maintained a position of dominance and the plaintiff was dependent on Zimmer during the relationship of more than 11 years. Zimmer dictated the size of Masiello's territory, prices and commissions, and, as in *Rampell*, exploited the same type of confidential and proprietary information which Masiello was required to provide Zimmer pursuant to agreement.

*Id.* at 365, 552 N.Y.S.2d at 937.

Whether Abernathy's allegations regarding the nature of its relationship with Pall are sufficiently analogous to those in *Rampell* and *Zimmer* to support a finding that the relationship was one of confidence is a close question. In some respects the facts of this case (as alleged by Abernathy) are stronger than in *Rampell* and *Zimmer*, and in other respects, weaker. However, viewed as a whole they are sufficient to establish that the relationship between Pall and Abernathy was confidential in nature and gave rise to a duty on Pall's part not to misuse Abernathy's proprietary customer information to Abernathy's detriment.

As in *Rampell* and *Zimmer*, the Exclusive Distribution Agreement imposed on Abernathy an obligation to report to Pall all of its sales of Pall products, the names and addresses of Abernathy's customers, and the types of filters they used. In addition, pursuant to a long-standing extra-contractual practice, Pall employees frequently accompanied Abernathy salespeople on customer visits, thus giving Pall direct access to the identity of the appropriate contact people at Abernathy's customers, as well as an opportunity to assess those customers' potential future needs for filtration products. Finally, pursuant to the SITES amendment, Abernathy was also required to supply Pall with concededly valuable information on filter element change-out dates.

Furthermore, these contractually-required disclosures took place over the course of a much longer-term relationship than existed in the *Rampell* and *Zimmer* cases, viz., forty or more years as opposed to fifteen and eleven years, respectively. In addition, just as in *Rampell*, Abernathy has alleged that prior to its investment of substantial money, time and effort, Pall had a few sales in the territory Abernathy covered. Finally, the evidence submitted on this motion confirms the Court of Appeals's general suppositions that a manufacturer enjoys a position of dominance over the distributor and that the two do not bargain at arms length: sales of Pall products constituted the bulk of Abernathy's revenues, and Pall was, therefore, able to place numerous demands on Abernathy over the years, including an alleged requirement that Abernathy help facilitate a potentially illegal scheme to inflate Pall's publicly-reported sales figures, *see supra* Background (10); *infra* Discussion (5).

On the other hand, the acts constituting the alleged breach of the confidential relationship in this case are, of course, far less egregious than those in *Rampell* or *Zimmer*. Pall did not usurp any of Abernathy's employees; nor did it commence direct sales after the termination. Instead, Pall only hired another distributor, and Abernathy has not produced any evidence to suggest that Pall terminated Abernathy for any reason other than a desire to have a better distributor in the Territory.[16]

---

**16.** It should be noted that the commission schedule on which Fluid Flow operated after Abernathy's termination paid slightly lower commissions that those Abernathy had been paid on high dollar value sales of certain types of filters. (*Compare* Ortego Affirm., Ex.

The crucial lesson of *Rampell* and *Zimmer* for this case, however, is that a long-standing distributorship relationship in which the manufacturer dominated the distributor, and pursuant to which the distributor was contractually required to disclose proprietary information regarding its customers to the manufacturer, creates a duty on the part of the manufacturer not to use that information to the detriment of the distributor. Thus, while the equities of this case are much less compelling than in *Rampell* or *Zimmer*, the fact that the manufacturer's duty of fidelity was breached in a different manner in this case is irrelevant for the purposes of establishing whether such a duty existed in the first place.[17]

In light of the foregoing, the second question posed by the present motion—whether a reasonable jury could find that Pall and Abernathy did in fact stand in the type of confidential relationship described in *Rampell* and *Zimmer*—almost answers itself. Pall has not disputed any of the facts relevant to the question of whether a confidential relationship existed between the two companies, e.g., the length of the relationship, Abernathy's efforts to develop customers for Pall's products, or the fact that Pall contractually required Abernathy to turn over its customer information. Accordingly, Abernathy's trade secrets claim is sufficiently well-supported as a matter of both law and fact to present a triable issue for the jury.

**d. The Exclusive Distribution Agreement did not give Pall a contractual right to supply Abernathy's customer information to the new distributor.**

As a defense to Abernathy's trade secrets claim, Pall suggests a reading of the Exclusive Distribution Agreement pursuant to which it had a contractual right to supply Fluid Flow with Abernathy's customer information. Under New York law, a person may, in some circumstances, modify a common law duty that he owes to another through a contract freely and voluntarily entered into by the other, provided that the person does not thereby purport to relieve himself of an independent duty that he owes to the public. *See* 22 N.Y. Jur.2d Contracts § 188, at 226 (1996) (citing *Johnston v. Fargo*, 184 N.Y. 379, 77 N.E. 388 (1906)). Assuming for the sake of argument that Pall's duty of fidelity to Aber-

---

C, Exclusive Distribution Agreement Between Pall Trinity Micro and Abernathy, App. D, *with* Exclusive Distribution Agreement Between Pall Trinity Micro and Fluid Flow, App. D, attached as exhibit to Letter from Defendant's Counsel to Chambers of 5/8/00.) However, because no evidence has been presented to the court regarding the volume of such high dollar value orders placed by consumers of Pall products in the Territory, it is impossible to assess whether the small differences between the two commission schedules led to a material reduction in Pall's overall distribution costs and, hence, whether a desire to realize such a reduction in cost at Abernathy's expense was a motivating factor in Pall's decision to terminate Abernathy.

By way of illustration, whereas Pall's contract with Abernathy provided for a commission of $25,250 plus 2 1/2% of the amount over $500,000 on sales of "Special Housings" and "Porous Metal Products" valued between $500,001 and $1,000,000, the commission on the same type of order under the Pall–Fluid Flow contract is $24,250 plus 2 1/2% of the amount over $500,000, i.e., $1,000 less. (*Id.*) Thus, on a sale of $750,000 worth of porous metal products, Pall would have paid Abernathy a commission of $31,500, but would have paid Fluid Flow $30,500. In contrast to these relatively small differences, the Pall–Abernathy and Pall–Fluid Flow contracts provided identical commissions on all sales of "Standard Disposable Cartridges/Housings" and "Nuclear–Style Elements," and on sales of special housings and porous metal products valued up to $100,000. (*Id.*)

17. Section VII of the Agreement, which governs direct sales by Pall to its distributors' customers, appears to reflect a recognition of Pall's duty not to use a distributor's customer information to the distributor's detriment. That provision allows Pall to make direct sales, but only on the condition that Pall pay the distributor the same commission to which it would have been entitled had the distributor negotiated the sale itself. (*See* Ortego Affirm., Ex. C, § VII(a),(d).)

nathy can be waived by contract, Pall's defense, nonetheless, fails because the interpretation of the Agreement that Pall offers in support of its argument must be rejected as contrary to general principles of contract interpretation.

Pall's argument proceeds by reference to two separate provisions of the Agreement. First, Pall notes that Paragraph (f) of the section of the Agreement entitled "Certain Covenants of the Distributor" gave Pall the right to "use [its distributor's customer] information as it sees fit to aid in the distribution, marketing, sales, promotion, or manufacture of its Products." (Ortego Affirm., Ex. C, § IV(f).) Next, Pall notes that Paragraph (b) of the section entitled "Termination" gave it the right to appoint a new distributor upon termination of the Agreement. (*Id.* § VIII(b).) Pall then reasons that, when read together, the two provisions give it the right to supply a former distributor's customer information to a new distributor, as long as doing so will aid in the distribution, marketing, sales, promotion, or manufacture of Pall's products. (Def.'s Mem. Supp. I, at 14; Def.'s Reply Mem. Supp. Def.'s Mot. Summ. J. at 6–7 [hereinafter Def.'s Mem. Supp. II].)

Not surprisingly, Abernathy disputes this interpretation and denies that it intended to accord Pall any such right when it signed the Agreement. (Pl.'s Mem. Opp'n I, at 13–14.) Inasmuch as the interpretation of a contract is a question of law, *see Hudson Iron Works, Inc. v. Beys Specialty Contracting, Inc.*, 262 A.D.2d 360, 362, 691 N.Y.S.2d 132, 133 (2d Dep't 1999); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Robert Christopher Assocs.*, 257 A.D.2d 1, 11, 691 N.Y.S.2d 35, 43 (1st Dep't 1999), the court will undertake its own interpretation of the Agreement.

As an initial matter, the obvious purposes of the disclosure provision of § IV(f) would appear, on a fair reading of the Agreement, to be two-fold: (1) to allow Pall to monitor its distributor's performance and (2) to track the sales of its products so that it could effectively channel its marketing and product development efforts. Nothing in the language of § IV(f) when considered alone even hints that by signing the Agreement, its distributors agree to give Pall the right to use their customer information in a way that would injure the distributors.

Of course, Pall's argument is that § IV(f) should not be read in isolation. However, § IV(f) and the termination provision upon which Pall relies in framing its interpretation occur in two completely different sections of the Agreement, which are separated by several pages and each of which contains numerous other provisions. In light of the apparent purposes of § IV(f) and the relative placement of the two provisions within the contract, Pall's argument that Abernathy should have drawn the purported connection between §§ IV(f) and VIII(b), (*see* Def.'s Mem. Supp. I, at 14), is patently unreasonable.

Moreover, three canonical principles of contract interpretation counsel against giving the Agreement the construction Pall wishes to place upon it. First, clauses that limit a contracting party's common law liability, while not necessarily invalid, are to be strictly construed. *See Terminal Central, Inc. v. Henry Modell & Co.*, 212 A.D.2d 213, 218, 628 N.Y.S.2d 56, 59 (1st Dep't 1995); *Zoller v. Niagara Mohawk Power Corp.*, 137 A.D.2d 947, 950, 525 N.Y.S.2d 364, 367 (3d Dep't 1988); 22 N.Y. Jur.2d Contracts § 273 (1996). Here, the general language of § IV(f)'s provision that Pall may make use of its distributor's customer information in any way that it see fits cannot by itself encompass a use of that information that would otherwise subject Pall to liability for breach of a duty of fidelity owed to the distributor. The principle of strict construction of exculpatory clauses requires that such a consequence be expressly stated, not merely implied. Pall's invocation of language from a separate section of the Agreement giving it the right to appoint a new distributor falls far short of such an express statement.

For much the same reason, the principle that contracts should be interpreted so as to avoid unfair or anomalous consequences also argues against Pall's interpretation. *See Browning-Ferris Indus. of N.Y., Inc. v. County of Monroe*, 103 A.D.2d 1040, 1041, 478 N.Y.S.2d 428, 430 (4th Dep't 1984); 22 N.Y. Jur.2d Contracts § 222 (1996). The implicit waiver of Pall's duty of fidelity that Pall reads into the Agreement is just such an unfair and surprising result.

In light of these observations, the Agreement is, at best, ambiguous as to whether Pall had the contractual right to supply Abernathy's successor with Abernathy's customer information. In accordance with the interpretive principle that ambiguities in a written contract are to be construed against the drafter, *see Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283 (1985); *Garcia v. American Gen. Life Ins. Co. of New York*, 264 A.D.2d 808, 809, 695 N.Y.S.2d 420, 421 (2d Dep't 1999); 22 N.Y. Jur.2d Contracts § 260 (1996)—here, Pall—the reading of the Agreement urged by Pall, and hence its contract-based defense to Abernathy's trade secret claim, must be rejected. The Agreement did not give Pall a contractual right to supply Abernathy's replacement with the information supplied to Pall by Abernathy pursuant to § IV(f).

### e. Damages

■ If the jury finds Pall liable on Abernathy's trade secret claim, that finding would not imply that Abernathy is entitled to damages for all sales of filtration products lost to Fluid Flow for an indefinitely long period of time after the termination. The proper measure of damages for unfair competition and for the misappropriation and exploitation of confidential information is the loss of profits sustained by reason of the improper conduct. *See Allan Dampf, P.C. v. Bloom*, 127 A.D.2d 719, 720, 512 N.Y.S.2d 116, 117 (2d Dep't 1987). Thus, Pall would be liable only for the profits that Abernathy would have earned on sales that were lost to Fluid Flow after the termination as a result of Pall having supplied Fluid Flow with confidential customer information Fluid Flow did not already possess.[18]

■ In addition, the extent to which Abernathy's damages were caused by Pall's misuse of Abernathy's customer information necessarily changed over time. Abernathy has alleged that it would take a minimum of several months, (Tr. at 12), and possibly as long as two years, (Ellis Decl. I, ¶ 19), for Fluid Flow to duplicate Abernathy's customer information. This places an outer bound of two years on the period during which Abernathy's lost profits could be attributed to Pall's alleged breach of its duty of fidelity. By Abernathy's own estimate then, Fluid Flow could have developed through its own efforts the same customer information possessed by Abernathy on the second anniversary of the termination, i.e., by March of 1995. At that point, had there been no breach by Pall, Abernathy and Fluid Flow would have legitimately possessed the same knowledge of the filter market in the Territory, and any sale Abernathy lost to Fluid Flow would have to be due to the

---

18. As noted previously, Abernathy was without a supplier of industrial filters for two months. *See supra* note 10. One might, therefore, suppose that Abernathy could not have made industrial filter sales during that period anyway. On this supposition, Fluid Flow's activities during the two first months are irrelevant to damages calculation: without a supply of filtration products, Abernathy could not have made filter sales during that time and thus lost no sales. The catch is that Abernathy alleges that it had a stock of Pall merchandise on hand after the termination which it attempted to sell to its regular customers, only to find that Fluid Flow had beaten it to the sale. (*See* Tr. at 15.) If that is so, then Abernathy could have made filter sales during the two months following termination, although the amount of Pall inventory it possessed at that time will set an upper bound on Abernathy's potential recovery of lost profits for the two-month period immediately following the termination.

customer's preference for Pall filters or superior marketing by Fluid Flow.

In sum, under the facts of this case, the appropriate measure of damages is (1) the amount of the profits that Abernathy would have earned on sales Abernathy lost to Fluid Flow (2) as a result of Fluid Flow's use of Abernathy's customer information (3) from the date on which Abernathy's termination became effective (4) until the date on which Fluid Flow could have, through the exercise of reasonable diligence, finished compiling that information on its own. In light of Abernathy's own estimates, the latter date could not be later than March 11, 1995, i.e., the date two years after Abernathy's termination became effective.

Abernathy's potential damages are subject to two final factual considerations. First, Pall could escape liability for sales to particular customers if it could show that Fluid Flow was already familiar with those customers before Pall supplied it with any of Abernathy's information. On this point, Abernathy's Jim Ellis alleged in deposition that Fluid Flow did not sell industrial filters prior to signing on as Pall's new distributor. (Ellis Dep. at 117.) On what basis Ellis had personal knowledge of that fact (so as to render his testimony admissible) is unclear. Nevertheless, leaving that question aside and assuming that his statement is accurate, the fact that Fluid Flow did not previously sell industrial filters would not show that Fluid Flow did not share some customers with Abernathy. For all that has been shown at this point, Fluid Flow may have previously marketed other types of industrial supplies to some of the same industrial customers to whom Abernathy had sold Pall filters. In that case, there would be nothing improper about Fluid Flow advising existing customers that it was now distributing filtration products as well and making any sales that resulted from advertising that fact.

The second remaining relevant factual consideration regarding possible damages limits the impact of the first. One of the principal issues in this case is Pall's misuse of information developed by Abernathy on customer change-out dates. Even if Abernathy and Fluid Flow shared a particular customer before Pall disclosed any of Abernathy's proprietary information to Fluid Flow, Pall would still be liable to Abernathy for lost profits if Fluid Flow was able to beat Abernathy to the sale of replacement filter elements as a result of Pall's disclosure of Abernathy-generated SITES information.

On the record presently before the court, no evidence relevant to any of these damages issues appears to have been developed by either of the parties. Indeed, at the present time, there is no admissible evidence on which damages, as outlined above, could be proven with reasonable certainty. Jim Ellis's allegations on these issues consist either of statements which appear to be beyond his personal knowledge, viz., his statements regarding the identity of Fluid Flow's existing customers, or hearsay allegations, viz., his testimony that former customers told him that they had been contacted by Fluid Flow salespeople. (*See* Ellis Dep. at 115–17.) The only admissible evidence now before the court on causation of damages is Festa's party admission that Pall provided SITES information to Fluid Flow when it took over as Pall's new distributor in the Territory. (*See* Festa Dep. at 86–87.) This general admission provides no basis on which a jury could quantify damages.

The parties' failure to develop relevant evidence on damages appears to be attributable the parties' understandable focus up to this point on the question of liability. For this reason, summary judgment on the issue of damages would be premature at this stage of the litigation. The interest of justice would be better served by allowing the parties to take additional discovery on the limited issue of the amount, if any, of Abernathy's damages caused by Pall's alleged misuse of Abernathy's customer information. Such evidence could consist of, inter alia, business records from either

Fluid Flow or Pall, or customer affidavits, indicating that Fluid Flow sold Pall products to former Abernathy customers shortly after the termination and that these customers were not existing Fluid Flow customers. Also relevant would be evidence from those same sources showing that shortly after the termination, Fluid Flow made sales of Pall products to former Abernathy customers on the relevant filter change-out dates.

(3)

Abernathy's next claim is that by terminating the distributorship, Pall tortiously interfered with its contracts with its customers and other principals. Specifically, Abernathy asserts that DuPont terminated a supply contract with Abernathy, and a principal called Thermon terminated a distributorship agreement with Abernathy, after they learned that Abernathy lost the Pall contract. (Ellis Dep. at 273; Ellis Decl. I, ¶ 16.) According to Abernathy, DuPont was concerned that Abernathy would not be able to find another supplier of filtration products soon enough to meet its needs, and Thermon was concerned that without the Pall contract, Abernathy would not be able to maintain a large enough sales force to promote its products. (*Id.*) Neither allegation states a claim for tortious interference with contract.

To prove tortious interference with contract under New York law, plaintiff must show: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370 (1996); *Shannon v. MTA Metro–North R.R.*, 269 A.D.2d 218, 704 N.Y.S.2d 208, 209 (1st Dep't 2000); *Velazquez v. Lackmann Food Servs. at Old Country Rd., Inc.*, 251 A.D.2d 495, 496, 674 N.Y.S.2d 413, 414 (2d Dep't 1998). Abernathy did not even implicitly allege knowledge or intentional procurement in its First Amended Complaint. (*See* First Am. Compl. ¶ 21.) Moreover, on this motion, Abernathy has produced absolutely no evidence that Pall knew of its contracts with DuPont or Thermon, nor that Pall had any contact with DuPont or Thermon at any time, much less that Pall took any actions that could be construed as intentionally procuring those companies to terminate their contracts with Abernathy.

In its opposition brief, Abernathy argues that it need only show that, but for Pall's terminating the distributorship, DuPont and Thermon would not have terminated their contracts with Abernathy. (Pl.'s Mem. Opp'n I, at 16.) That is simply not a correct statement of New York law. While it is certainly true that, in order to prove causation of damages, Abernathy must make a threshold showing that Pall's actions were a "but for" cause of its losing those other contracts, by itself that showing is not sufficient by itself to prove Abernathy's tortious interference claim: Pall's knowledge of the contracts and its intentional procurement of their termination are required as well. *See Lama Holding*, 88 N.Y.2d at 424, 646 N.Y.S.2d at 82, 668 N.E.2d 1370; *Shannon*, —— A.D.2d at ——, 704 N.Y.S.2d at 209; *Lackmann Food Servs.*, 251 A.D.2d at 496, 674 N.Y.S.2d at 414. Accordingly, Pall's motion for summary judgment on Abernathy's tortious interference claim is granted.

(4)

In Count V of its First Amended Complaint, Abernathy asserts that, as a result of their longstanding relationship and Pall's position of dominance over Abernathy, Pall had a fiduciary duty (1) not to terminate Abernathy's distributorship, and (2) "to truthfully disclose in a timely manner to Abernathy all material information concerning such role." (First Am. Compl. ¶ 22; *see* Pl.'s Mem. Opp'n I, at 9–11.) Abernathy claims that by con-

cealing its intention to terminate Abernathy and, ultimately, by terminating Abernathy, Pall breached this fiduciary duty. (*Id.*)

Both prongs of this claim must be rejected. Although, on the facts alleged by Abernathy, Pall does owe Abernathy a fiduciary duty with respect to Abernathy's trade secrets, that fiduciary duty is limited in scope and does not encompass the obligations asserted by Abernathy in its claim for breach of fiduciary duty.

First, Abernathy's assertion that Pall did not have the right to terminate the relationship at all is patently false: The Exclusive Distribution Agreement and the Sales Representative Agreement expressly give both parties the right to terminate the relationship at any time, with or without cause, on thirty days notice. (*See* Ortego Affirm., Ex. C, § VIII(a); *id.*, Ex. D, § VI(a), (c).) Moreover, even if Pall and Abernathy had actually stood in that quintessential fiduciary relationship, the partnership, *see Meinhard v. Salmon*, 249 N.Y. 458, 463–64, 164 N.E. 545, 546 (1928) (Cardozo, C.J.), Pall would have had the right to terminate the relationship at any time, absent an agreement to the contrary, *see* N.Y. Partnership Law § 62(1)(b) (McKinney 1988); 15 N.Y. Jur.2d Business Relationships § 1655 (1996). Of course, if one partner misappropriates a partnership asset or business opportunity and then dissolves the partnership, the misappropriating former partner may be liable for breach of fiduciary duty to the other former partner(s). *See* 15 N.Y. Jur.2d Business Relationships §§ 1458, 1467–68 (1996). The fact that there would be liability in that situation provides no support for Abernathy's claim, however, because, in such a case, the breach of fiduciary duty lies in the misappropriation, not in the simple fact of termination. Since Abernathy is apparently relying only on the fact of the termination to support its breach of fiduciary duty claim, the first prong of its fiduciary duty claim must be dismissed.

Turning to the second prong of Abernathy's breach of fiduciary duty claim, Pall did not have a duty to disclose its alleged intentions to terminate Abernathy beyond its contractual duty to give Abernathy thirty days notice. Nothing in *Rampell* or *Zimmer* suggests otherwise. In fact, in *Rampell*—a case otherwise helpful to Abernathy, the distributor had contested the validity of a provision in its contract with the defendant manufacturer that allowed the manufacturer to terminate without any prior notice. The New York Court of Appeals rejected this claim and upheld the manufacturer's exercise of the provision—despite having previously found that the manufacturer was in a position of dominance over the distributor and that the relationship was a longstanding one. *See Rampell*, 3 N.Y.2d at 380–82, 165 N.Y.S.2d at 485–86, 144 N.E.2d 371. Even in those circumstances, the Court of Appeals held that the distributor was legally entitled to no more than a reasonable notice period, a right which could be, and was in that case, validly waived by contract. *See id.* at 381–82, 165 N.Y.S.2d at 486, 144 N.E.2d 371.

Nonetheless, Abernathy argues that the mere fact that Pall was in a position of superior knowledge with regard to its own intentions regarding the future of the relationship gave it a fiduciary duty to disclose those intentions. (Pl.'s Mem. Opp'n I, at 10–11.) In so arguing, Abernathy is not, to be perfectly precise, stating a breach of fiduciary duty claim. Instead, Abernathy is simply recasting its fraudulent concealment claim on the basis of the principle that, in the absence of a fiduciary relationship, a duty to disclose may arise that will support a fraudulent concealment claim if, inter alia, " 'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.' " *Remington Rand Corp. v. Amsterdam Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir.1995) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir.1984) (applying New York

law)). So recast, Abernathy's fraudulent concealment claim fails to present a triable issue for the same reasons previously discussed: viz., Abernathy has not produced clear and convincing evidence either (1) that Pall made the decision to terminate Abernathy before it gave the contractually required notice or (2) that Abernathy suffered damage as a result of the alleged concealment of the possibility that Abernathy would be terminated. *See supra* Discussion (1)(c).

Accordingly, Pall's motion for summary judgment on Abernathy's breach of fiduciary duty claim is granted.

### (5)

Both parties have moved for summary judgment on Abernathy's claim that it is due $62,867 pursuant to an alleged oral agreement whereby Pall promised to pay Abernathy a special five percent commission, over and above the regular commission, on certain nuclear filters in exchange for Abernathy's storing the filters at its facilities.

### a. Pall's Motion for Summary Judgment

Pall makes two arguments in support of its motion for summary judgment on Abernathy's special commissions claim: one based on the Statute of Frauds, and the other based on the statute of limitations. Each is considered in turn below.

### i. Statute of Frauds

Pall argues that the oral agreement alleged by Abernathy is a contract for the sale of goods valued in excess of $500 and, thus, is subject to the statute of frauds provision of Article 2 of the Uniform Commercial Code. *See* N.Y. U.C.C. § 2–201 (McKinney 1993). Although Abernathy is correct that the agreement it alleges is not one for the sale of goods as defined in the U.C.C., but rather a services contract, (*see* Pl.'s Mem. Opp'n Def.'s Cross–Mot. Summ. J. at 5–6 [hereinafter Pl.'s Mem. Opp'n II]) (discussing N.Y. U.C.C. § 2–106(1) (McKinney 1993)), the agreement does, nonetheless, fall within the Statute of Frauds.

Under New York General Obligations Law § 5–701(a)(1) (McKinney 1989), an agreement that, by its terms, is not capable of performance within one year from the time that it is made is void unless it is evidenced by a written note or memorandum subscribed to by the party against whom its enforcement is sought. Because payment on a commission agreement depends not on the will of the parties to the agreement, but on the contingent action of a third-party, viz., the buyer, New York courts have held that commission agreements that have no specified termination date are agreements that are not capable of performance within one year of their making within the meaning of § 5–701(a)(1). *See North Shore Bottling Co. v. C. Schmidt & Sons Inc.*, 22 N.Y.2d 171, 177–78, 292 N.Y.S.2d 86, 90–91, 239 N.E.2d 189 (1968); *Agee v. Read Q Sys., Inc.*, 70 A.D.2d 805, 805, 417 N.Y.S.2d 494, 495 (1st Dep't 1979); 61 N.Y. Jur.2d Frauds, Statute of § 39, at 92–93 (1987); *see also Currier v. Prudential Ins. Co. of Am.*, 266 A.D.2d 596, 597, 697 N.Y.S.2d 774, 775 (3d Dep't 1999) (holding that oral brokerage agreement falls within the Statute of Frauds since its performance depends on the will of a third-party). As an exception to this rule, a commission agreement will be deemed performable within one year if it is terminable at any time upon the will of one or both of the parties, or upon the performance of an act within the control of one of the parties. *See North Shore Bottling*, 22 N.Y.2d at 177–78, 292 N.Y.S.2d at 90–91; , 239 N.E.2d 189 61 N.Y. Jur.2d Frauds, Statute of § 39, at 93 (1987). However, to remove an agreement from the Statute of Frauds, the power to terminate a contract must be an express term of the agreement. *See D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 456, 483 N.Y.S.2d 164, 167, 472 N.E.2d 992 (1984) (holding that *"explicit option to terminate"* takes agreement out

of Statute of Frauds (emphasis added)); *Burke v. Bevona,* 866 F.2d 532, 538 (2d Cir.1989) ("The New York cases uniformly hold that implied termination terms are not sufficient to take an oral contract out of the statute. The terms must be express."); *Volmar Distribs., Inc. v. New York Post Co.,* 825 F.Supp. 1153, 1168 (S.D.N.Y.1993).

■ In this case, Abernathy alleges that the commissions accrued when a customer ordered a nuclear filter from Pall and Abernathy shipped the invoiced filters back to Pall. (Pl.'s Mem. Opp'n II, at 3.) Hence, performance of the contract was dependent on contingent actions of a third-party, viz., whether a customer ordered a nuclear filter, that might have occurred more than one year after the agreement was made. Moreover, Abernathy has made no allegations and has presented no evidence regarding the conditions under which the agreement was terminable or whether it had any specific termination date. Thus, Abernathy has not shown the existence of termination conditions that would remove the agreement from the reach of General Obligations Law § 5–701(a)(1). Consequently, in order for the oral commissions agreement to be enforceable, Abernathy must produce a note or memorandum subscribed to by Pall that evidences the agreement.

■ On a motion for summary judgment, the question of whether a note or memorandum is on its face sufficient to satisfy the Statute of Frauds is a matter of law for the court to decide. *See Bazak Int'l Corp. v. Mast Indus., Inc.,* 73 N.Y.2d 113, 118, 538 N.Y.S.2d 503, 505, 535 N.E.2d 633 (1989) (Kaye, J.); *Rohrwasser v. Al & Lou Constr. Co.,* 82 A.D.2d 1008, 1008, 442 N.Y.S.2d 171, 172 (3d Dep't 1981); *Lashway v. Sorell,* 51 A.D.2d 97, 98, 380 N.Y.S.2d 334, 336 (3d Dep't 1976); *Merex A.G. v. Fairchild Weston Sys., Inc.,* 810 F.Supp. 1356, 1367 (S.D.N.Y.1993), *aff'd,* 29 F.3d 821 (2d Cir.1994). In *Bazak,* the New York Court of Appeals held that·a trial court erred in ruling that the suffi-

ciency of writings to satisfy the Statute of Frauds is a matter of fact to be determined at trial. *See Bazak,* 73 N.Y.2d at 118, 538 N.Y.S.2d at 505, 535 N.E.2d 633. Instead, the court explained, "[t]hat issue must be determined from the documents themselves, as a matter of law," for "[c]onsideration of parol evidence in assessing the adequacy of a writing for Statute of Frauds purposes would otherwise undermine the very reason for a Statute of Frauds in the first instance." *Id.* Therefore, it is necessary to examine the principles for assessing the sufficiency of writing that are relevant to this case.

■ First, the note or memorandum requirement may be satisfied by a single writing or by a series of writings, provided they express all essential terms of the agreement. *See Henry L. Fox Co. v. William Kaufman Org., Ltd.,* 74 N.Y.2d 136, 140, 544 N.Y.S.2d 565, 567, 542 N.E.2d 1082 (1989); *Syman v. Vanderheuval,* 249 A.D.2d 870, 872, 672 N.Y.S.2d 454, 455–56 (3d Dep't 1998); *V. Ponte & Sons, Inc. v. American Fibers Int'l,* 222 A.D.2d 271, 271, 635 N.Y.S.2d 193, 194 (1st Dep't 1995). Moreover, the writing(s) must express those terms with reasonable definiteness and certainty, so that the substance thereof will appear from the writing(s) without any resort to parol evidence. *See Ward v. Hasbrouck,* 169 N.Y. 407, 411, 62 N.E. 434, 435 (1902); *Aceste v. Wiebusch,* 74 A.D.2d 810, 810, 425 N.Y.S.2d 369, 370 (2d Dep't 1980); *Dorman v. Cohen,* 66 A.D.2d 411, 412, 413 N.Y.S.2d 377, 378–79 (1st Dep't 1979); 61 N.Y. Jur.2d Frauds, Statute of § 156, at 244 (1987).

In view of the correspondence between Abernathy and Pall, and Festa's admissions, there plainly was some type of agreement along the lines alleged by Abernathy. *See supra* Background (10). But, contrary to Abernathy's argument, that correspondence does not establish all of the essential terms of the agreement. Specifically, the correspondence does not unambiguously support Abernathy's alle-

gation that the special commission was to be five percent on all nuclear filters stored pursuant to the agreement.

In a memorandum from Rapone to Ellis dated April 8, 1993, Rapone states that on certain orders "Pall paid 10%. Should have paid 15%." (Everts Aff., Ex. A, Memorandum from Rapone to Ellis of 4/8/93, at 1.) This statement tends to confirm Abernathy's description of the commission agreement. However, in discussing other orders, Rapone stated that "Pall paid 12.5%. Should have paid 15%." (*Id.* at 1–2.) The Exclusive Distribution Agreement commission schedule provides for three different rates depending on the type of nuclear filter sold: 12.5%, 10%, and 7%. (Ortego Affirm., Ex. C, Exclusive Distribution Agreement Between Pall Trinity Micro and Abernathy, App. D, § B.) The Rapone memorandum provides specific part numbers for the orders that were paid at 12.5% instead of 15%, but no evidence has been presented to the court to indicate into which commission category these orders would have fallen absent the alleged sur-commission agreement. If the filters for which Pall mistakenly paid a commission of only 12.5% were in the category for which there would have ordinarily been a 10% commission, then the accounting mistake to which Rapone referred would be the mistake of paying only 2.5% as a special commission, instead of 5%. If this were the case, the Rapone memorandum would confirm that a 5% special commission was to be paid on all nuclear filters, just as alleged by Abernathy.

If, on the other hand, the filters for which Pall mistakenly paid a commission of only 12.5% were in the category of filters for which there would have ordinarily been a 12.5% commission, then the accounting mistake to which Rapone referred would be the mistake of paying no special commission instead, apparently, of paying a 2.5% special commission. Thus, the writings before the court are ambiguous as to whether there was, as Abernathy claims, a 5% special commission on all

nuclear filters, or a 5% special commission on some, but a 2.5% commission on others.

■■■ Abernathy, however, makes an additional argument for taking the agreement out of the Statute of Frauds. On November 22, 1993, Prevatte, who owns a ten to twelve percent stake in Abernathy, (*see* Prevatte Dep. at 7), sent Pall's then-CEO Maurice Hardy a three-page letter in which he voiced a number of complaints regarding Pall's treatment of Abernathy. (Ellis Decl. of 9/27/99, Ex. B.) Among other things, Prevatte complained that:

> We kept Nuclear cartridge inventory in our stock and were only given an extra 5% commission when the cartridges were shipped. When the customer ask [sic] for a shipment we had to returned [sic] the cartridges to Cortland [Pall's headquarters] before shipment to the Utility Company to create the illusion that the material was shipped direct from the factory. This could have effected [sic] shelf life as well as other nuclear certifications that were required by the NRC and the utility co that purchased the cartridges.

(*Id.* at 2.) Hardy wrote back with a one-page letter, which included the following paragraph:

> You make a point about our nuclear cartridge handling that I take very seriously. Your concern about the nuclear cartridges in your stock not meeting NRC requirements in [sic] unfounded. The reason you were asked to return them to [Pall] prior to shipment to the utility was to carry out all necessary Quality Control inspections at [Pall] to assure complete compliance with all regulations and customer specifications.

(*Id.*, Ex. C.) Abernathy argues that because Hardy responded to the charge about possible violation of NRC regulations, but remained silent regarding the amount of commission to be paid, Hardy's letter should be deemed an admission by silence that satisfies the writing require-

ment of the Statute of Frauds. (Pl.'s Mem. Opp'n II, at 6.)

Abernathy cites no authority for the proposition that an admission by silence can constitute a writing sufficient to satisfy the Statute of Frauds. (*See id.*) There appears to be only one decision discussing New York law that suggests an admission by silence in a writing is sufficient to overcome a Statute of Frauds defense. In *Hellenic Lines Ltd. v. Gulf Oil Corp.*, 340 F.2d 398 (2d Cir.1965), a shipping line sent a letter to a fuel oil supplier, in which the shipping line enclosed executed copies of a maritime fuel oil contract. The letter included a proviso that read: "We are, of course, signing these contracts on the strength of our agreement that you would ship cargo per our ships with freights corresponding to the value of the fuel we would be purchasing from you." *Id.* at 400 n. 1. Gulf Oil wrote back, stating: "We wish to acknowledge receipt of five executed copies of our Marine Fuel Oil Contract for 1959. . . . We have notified our Traffic Department of this and they will be glad to cooperate to our mutual advantage." *Id.* n. 2. Gulf Oil subsequently refused to perform the oral affreightment agreement alluded to in Hellenic's letter and raised New York's Statute of Frauds as a defense. The Second Circuit rejected the defense, holding that because Hellenic's reference to the alleged affreightment agreement would reasonably call for a reply if there had been no such agreement, Gulf Oil's subsequent letter accepting the fuel oil contracts without any disclaimer as to the affreightment agreement could con-

stitute an admission by silence of the existence of the oral agreement. *See id.* at 401.

*Hellenic Lines* is not controlling here for three reasons. First and foremost, the Second Circuit ultimately found New York law, and hence New York's Statute of Frauds, to be inapplicable to the case, because the oral contract in question was maritime in nature and, thus, subject to federal maritime law. *See id.* at 402. Second, unlike the plaintiff's letter in *Hellenic Lines*, Prevatte's letter did not reasonably call for a reply under the circumstances. The Prevatte letter must be seen for what it is: a laundry list of complaints by an obviously disgruntled former distributor who, in his opinion, had been wrongfully terminated.[19] As such, the letter did not call for any reply at all, and no adverse inference can be drawn against Pall for declining to answer some of the charges in the letter, including those relating to the alleged oral commissions agreement. Finally, the timing of Prevatte's letter further distinguishes it from that in *Hellenic Lines*. The letter in *Hellenic Lines* was sent contemporaneously with the execution of the fuel oil contracts to which Hellenic claimed the oral affreightment contract was linked. In contrast, the Prevatte letter was sent seven months after the dispute with Pall over the commissions erupted, thus raising the specter that Prevatte's statement regarding the amount of commissions due was self-serving. Absent any other pertinent authority in support, Abernathy's admission-by-silence argument must be rejected.[20]

(Ellis Decl. of 9/27/99, Ex. B, at 2–3.)

**19.** For instance, in the letter, Prevatte wrote:
> If Pall is so professional, why did they cancel the contract with my company without giving a reason for the cancellation? Why did Pall cancel with only the thirty days notice? . . .
> Pall should take a marketing survey of their *Customers* to determine what the customers think of Pall and their management. . . .
> I am not bitter, but I wanted you to know that I feel that we did all of the things that Pall wanted us to do and still got canceled. I don't think our cancellation was handled very professionally.

**20.** The *Hellenic Lines* dictum cannot be taken as persuasive authority as to how New York courts would treat Abernathy's admission-by-silence argument. *Hellenic Lines* cited only two decisions in support of its dictum: an Oregon state law decision, and an earlier Second Circuit decision that ultimately relied on a pre-*Erie* Supreme Court decision. *See Hellenic Lines*, 340 F.2d at 401 (citing *Willard Helburn Inc. v. Spiewak*, 180 F.2d 480 (2d Cir.1950); *Wieder v. Lorenz*, 164 Or. 10, 99 P.2d 38 (1940)). Moreover, those decisions

Abernathy's response to Pall's Statute of Frauds defense, therefore, stands or falls on the strength of the Rapone memorandum and the related correspondence from April of 1993 that Abernathy has produced. Because of the ambiguity as to the commission rate discussed above, these writings do not show with reasonable definiteness and certainty all the essential terms of the oral agreement alleged by Abernathy. Nonetheless, granting summary judgment in favor of Pall on Statute of Frauds grounds would be premature at this point, for it appears that the ambiguity could be resolved through minimal additional discovery. The Rapone memorandum lists the part numbers for each of the lots of nuclear filters in question. Pall presumably has business records that will establish into which of the categories listed in Appendix D of the Agreement the filters in question fall. Such records, when read in conjunction with the Agreement and the Rapone memorandum, should establish the precise terms of the oral commissions agreement.

■ Accordingly, in light of the facts that (1) there is substantial evidence that some type of commissions agreement existed along the lines alleged by Abernathy—viz., the April 1993 correspondence between Pall and Abernathy, and Festa's admissions that Abernathy did store nuclear filters for Pall and that it was "possible" that Pall paid Abernathy extra commissions in return for this service, and (2) the ambiguity as to the commission rate appears to be one that can be resolved without resort to parol evidence, Pall's Statute of Frauds defense is provisionally rejected, and Abernathy will be permitted to take

additional discovery on the limited issue of the identity of the filters for which part numbers are listed in the Rapone memorandum. When this additional discovery is completed, Pall may renew its motion for summary judgment if the evidence produced thereby fails to resolve the ambiguity in favor of Abernathy's claim of an across-the-board five percent commission rate.

## ii. Statute of Limitations

■ Pall argues in the alternative that Abernathy's commissions claim is time-barred. The statute of limitations on contract actions in New York is six years. *See* N.Y. C.P.L.R. § 213(2) (McKinney 1990). Pall argues that since Abernathy took delivery of the nuclear filters between 1987 and 1990, but did not raise its claim for unpaid commissions until it filed its Reply to Pall's counterclaims on February 11, 1998, Abernathy's claim is untimely. Leaving aside Abernathy's argument that the claim should relate back to its original Complaint filed on March 7, 1996,[21] the crucial flaw in Pall's argument is that there is no evidence before the court as to when the commissions actually accrued, and, hence, when the statute of limitations began to run.

According to Abernathy, the commissions did not become payable when Pall shipped the filters to Abernathy, but rather when Abernathy shipped the filters back to Pall for sale to a customer. Correspondence from Pall to Abernathy appears to establish this term of the agreement. Specifically, the Rapone memorandum of April 8, 1993, indicates that commissions

---

addressed the question of the admissibility of an admission by silence as a matter of evidentiary law; neither involved a Statute of Frauds defense.

21. Abernathy relies on a paragraph of its original Complaint that reads, in relevant part: Pall promised Abernathy that in return for Abernathy purchase of the inventory, Abernathy would receive better margins on products sold.... [O]ver a period of time,

because Pall had poor sales performances [sic], Pall shipped worthless inventory to Abernathy (such as in one instance $439,000 worth), which Abernathy would then turn around and have to return in the "next fical [sic] year" so that Pall ... used the $439,000 in inventory as a sales [sic] in one year, to make them look good in the fourth quarter end of the year period.
(Compl.¶ 26.)

were not paid on certain lots of inventory because there were "[n]o bookings on any subsequent orders by Duke [Power]," which was apparently the target customer for the nuclear filters. (Everts Aff., Ex. A, Memorandum from Rapone to Ellis of 4/8/93, at 1.) There is, however, no evidence before the court as to the sales dates of those filters that were sold to the customer, and, hence, no evidence as to when the commissions became payable. Since the statute of limitations is an affirmative defense under New York law, *see* N.Y. C.P.L.R. § 3018(b) (McKinney 1991), Pall bears the burden of proof on the issue of timeliness and, thus, must suffer the consequences of the lack of evidence on the issue. Pall's motion for summary judgment on the ground that Abernathy's special commissions claim is barred by the statute of limitations, is denied.

### b. Abernathy's Motion for Summary Judgment

■■■ Abernathy's motion for summary judgment on its commissions claim must be rejected, for even if one leaves aside Pall's Statute of Frauds defense, Abernathy has not shown that there is no genuine issue of fact on the question of whether it is owed commissions in the amount of $62,-867. Abernathy's proof of the amount it is allegedly owed consists exclusively of the following: Jim Ellis declares that, after reviewing Abernathy's financial records, "it [came] to [his] attention that Pall had paid $5,000 of the[ ] [special] commissions." (Ellis Decl. II, ¶ 22.) Abernathy then multiplies the dollar value of all nuclear filter inventory it allegedly stored pursuant to the agreement, viz., $1,357,346, by five percent, to get $67,867. (Pl.'s Mem. Supp. at 15.) Abernathy then subtracts the $5,000 payment from this latter figure to reach the claimed amount of $62,867. (*Id.*)

In response, Pall has raised a genuine issue of material fact as to whether any of the claimed $62,867 was, or is still, owed. (*See* Def.'s Mem. Opp'n at 5–6.) Specifically, the very same Pall memoranda from

April of 1993 that Abernathy relies upon to meet the Statute of Frauds purport to show that all commissions that were due Abernathy on nuclear filters were paid. The memoranda list the various lots of nuclear filters received by Abernathy and then go on to state that the additional commissions were either already paid, not paid because the customer never ordered the filters, or paid in the wrong amount. (*See* Ellis Decl. II, Exs. 9–11.) By Pall's final calculation, recited in Rapone's letter to Ellis of April 19, 1993, only $4,745.56 was left owing to Abernathy on nuclear filter commissions. (*See id.*, Ex. 10, at 2.) In none of its motion papers does Abernathy undertake to specifically refute any of these calculations.

Viewing this evidence in the light most favorable to the non-moving party—in this instance, Pall, a reasonable jury could find that Pall's calculations are accurate and that the $5,000 payment Ellis discovered in Abernathy's financial records was Pall's payment of its acknowledged debt of $4,745.56. Thus, on the evidence presented by Abernathy, a reasonable jury could find that Pall owes Abernathy nothing on the oral commissions agreement. Accordingly, a genuine issue of material fact exists with respect to the amount owed on the contract, and Abernathy's motion for summary judgment on its special commissions claim is, therefore, denied.

### c. Legality

There is a latent issue as to the legality of the oral commissions agreement, which, for reasons one can easily surmise, was not raised by either party, but which should at least be acknowledged. As described by Abernathy, the object of the agreement was to facilitate a scheme by Pall to mislead its shareholders, a scheme which, in turn, may have run afoul of the spirit, if not the letter, of certain nuclear power safety regulations. The agreement would, therefore, appear to involve an unlawful goal and, hence, be unenforceable under New York law. *See* 22 N.Y. Jur.2d Contracts § 162 (1996) ("A party may not suc-

cessfully attempt to enforce or defend upon a contract or part of a contract which is illegal under the laws of the State or of the United States.... Moreover, the courts will not be overzealous to enforce a contract the effect of which would be to weaken the effectiveness of a regulation designed for the protection of human life or property."); *see also id.* § 195, at 233 ("Any ... agreement designed or intended to accomplish the furtherance or effectuation of an unlawful purpose is unlawful, and every such ... agreement is void and unenforceable.").

Nonetheless, I will not make a sua sponte determination that the alleged special commissions agreement was unlawful for three reasons. First, whether an arrangement such as that alleged by Abernathy constitutes a violation of federal securities laws will often present complex issues of law and fact that should not be resolved without the benefit of briefing and discovery by the parties. Second, it is impossible for the court to determine on the current record whether the arrangement violated or skirted nuclear power safety regulations given that neither of the parties has identified the regulations in question.

Finally, even if the alleged agreement is illegal, it would probably still be enforceable under the circumstances of this case. There is New York case law to the effect that where there has been part performance of an illegal contract and the performing party entered the contract under duress or undue influence, relief may be granted. *See id.* §§ 201, 208. This principle is akin to the equitable principle that where two parties are not entirely *in pari delicto*, the unclean hands doctrine will not bar relief in favor of the less culpable party. *See* 55 N.Y. Jur.2d Equity § 121 (1986). Here, Jim Ellis testified that, despite the potentially unlawful purpose of the contract, Abernathy had "no choice" but to agree to it in light of the economic power Pall wielded over Abernathy. (Ellis Dep. at 284–85.)

Accordingly, in the absence of relevant briefing by the parties and in light of a substantial question of whether Abernathy is *in pari delicto* with Pall, the court will not sua sponte address the issue of the legality of the oral commissions agreement.

**(6)**

In the course of briefing on the instant motions, Pall withdrew its counterclaim for breach of contract and a debt owed. (Weller Affirm. of 9/14/99, Ex. A, Stipulation of Voluntary Dismissal.) Plaintiff's motion for summary judgment on defendant's counterclaim is, therefore, denied as moot.

**Conclusion**

For the foregoing reasons:

(1) Defendant's motion for summary judgment is granted on all claims except plaintiff's causes of action for (a) misuse of proprietary information and unfair competition, and (b) plaintiff's special commissions claim;

(2) plaintiff's cross-motion for partial summary judgment is denied; and

(3) the parties are granted leave to take additional discovery on the limited issues of (a) the extent of plaintiff's damages stemming from the alleged misuse of proprietary information, if any, and (b) what types of nuclear filters are designated by the part numbers listed in the Pall memoranda that plaintiff has submitted in satisfaction of the Statute of Frauds. Dated: Brooklyn, New York

SO ORDERED.